James LANCE, Appellant (Defendant below),

v.

STATE of Indiana, Appellee (Plaintiff below).

No. 381S62.

Supreme Court of Indiana.

Aug. 27, 1981.

George W. Gesenhues, Jr., New Albany, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

James Lance was convicted by a jury of robbery, a class A felony. Ind.Code § 35–42–5–1 (Burns 1979 Repl.). He was sentenced to the Indiana Department of Corrections for a period of fifty years. In his direct appeal, he raises the following issues for our review:

1. Whether the trial court erred when it admitted into evidence a pair of pants allegedly worn by defendant during the crime; and

2. Whether the trial court erred when it admitted into evidence a tape recording and transcription of defendant's confession. The record reveals that on the evening of February 26, 1980, Mr. and Mrs. Olin Hammer of New Albany, Indiana, were robbed in their home by two young men. Five dollars were taken from the victims; the seventy year old Mr. Hammer was severely beaten in the course of the robbery. The subsequent police investigation culminated in the arrest of defendant for the crime and conviction at issue here.

I.

Defendant maintains the trial court erred when it admitted into evidence a pair of pants allegedly worn by him during the commission of the robbery. His contention is based on the assertion that the trousers were seized in violation of his rights under the Fourth Amendment to the United States Constitution.

Whether a particular warrantless seizure violates the guarantees of the Fourth Amendment depends upon the facts and circumstances of each case. *South Dakota v. Opperman*, (1976) 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000; *Guardiola v. State*, (1978) 268 Ind. 404, 375 N.E.2d 1105. The state bears the burden of proving that the warrantless seizure fell within an exception to the warrant requirement. *Bruce v. State*, (1978) 268 Ind. 180, 375 N.E.2d 1042; *Ludlow v. State*, (1974) 262 Ind. 266, 314 N.E.2d 750. In our review of a trial court's ruling, we do not weigh the evidence; rather; we examine the evidence most favorable to the ruling, together with any uncontradicted adverse evidence. *Bruce v. State, supra; Rihl v. State*, (1980) Ind.App., 413 N.E.2d 1046.

The question whether the warrantless seizure at issue violated defendant's constitutional guarantees turns on the applicability of the "plain view" doctrine, a well-recognized exception to the Fourth Amendment requirement. Pursuant to the doctrine, a police officer rightfully occupying a particular location who inadvertently discovers items of readily apparent criminality may properly seize the items; evidence so seized is both admissible as evidence and usable for derivative purposes, for the seizure is not regarded as the product of a search within the meaning of the Fourth Amendment. *Coolidge v. New Hampshire*, (1971) 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564; *United States v. Gray*, (6th Cir. 1973) 484 F.2d 352; *Bruce v. State, supra; Candler v. State*, (1977) 266 Ind. 440, 363 N.E.2d 1233; *Alcorn v. State*, (1970) 255 Ind. 491, 265 N.E.2d 413; *see generally*, Berner *Search and Seizure: Status and Methodology* 8 Val.U.L.Rev. 471, 574 (1974). The elements of the "plain view" doctrine serve to define and perpetuate the standard of reasonableness to

which, pursuant to the Fourth Amendment, police are required to conform their conduct.

The record reveals that shortly after the robbery, New Albany police officers interviewed the Hammers. Mrs. Hammer described the perpetrators as approximately eighteen years of age and "very dirty" in appearance. Mr. Hammer stated that the two men, as part of their sham to gain entry to the residence, had indicated they knew Joe Fable, a young man who occasionally did yard work for the Hammers.

The New Albany police immediately contacted Fable, who resided in Louisville, Kentucky. Fable had few acquaintances in the New Albany area and indicated to police that, based on the age and lack of cleanliness of the perpetrators, the Lance brothers should be suspected. Fable agreed to escort police to the Lance residence.

Shortly after midnight Fable accompanied five policemen, two of whom were in uniform, to the home of defendant and his three brothers. Fable waited at the car while the officers proceeded to the front door. Detective Paul Parsons knocked on the door, which was answered by three of the brothers. According to Parsons, he then identified the group to the brothers, who told the officers "to step in and come into the house." The officers entered, placing themselves in an area approximately two to eight feet from and adjacent to the front door, just inside the Lances' living room. Parsons orally advised the brothers of their rights and asked them if they would accompany the officers to police headquarters for a talk.

The brothers, who were in various states of undress, began to put on clothing in the living room, which also doubled as a bedroom for three of the brothers. Piles of clothing littered the floor of the room. As the brothers reached for clothing from the various piles, the officers, wary for their personal safety, watched closely. From his position among the officers, Sergeant Dana Mertz observed some trousers lying on top of a pile of clothing at his feet. Mertz, who ultimately seized the trousers, testified on direct examination:

A. "* * * Of course, I'm not going to let anyone especially a suspect reach down in a heap of clothing without me watching them. I looked down and I seen the pants and I picked the pants up and I said who do these belong to? And at that time none said anything. The reason I seen the pants was because like I said, there was mud on them on the bottom that was fresh, they was wet, and what appeared at the time quite prominent, there was red dark spots on the front of them and they had a belt in them like someone had just taken them off."

Q. "Let's back up just a moment. You said you saw them starting to get dressed and you saw the pair of pants. When you saw the pair of pants, what prompted you to pick them up?"

A. "Because I had just left the scene of the victim's residence and there was a lot of blood. Also due to weather conditions, it appeared that one of these individuals had just entered that residence on Brook Street where was at and just removed those pants."

Q. "What led you to believe that?"

A. "Well, from the mud on the pants, from the pants being wet."

Q. "Did you have any indication at that time that whoever committed this crime was wearing the pants that might have been wet or muddy?"

A. "There was no indication, I had a strong indication that whoever injured Mr. Hammer in that extent and the amount of blood at the scene, that there would be blood on the person."

Q. "Well, did you obviously see blood on these bluejeans when you picked them up?"

A. "What appeared to me to be blood, yes."

Q. "This was prior to the time when you picked them up."

A. "I observed the pants laying right by my feet."

Q. "Okay."

A. "Or in a heap of clothing, and I observed that someone had just recently taken them off."

Q. "How did you ascertain that fact?"

A. "Well, because they was soaking wet and there was mud, all fresh mud. Someone had just came in and taken them off."

Q. "Alright. Did you observe blood on them before you picked them up?"

A. "Yes. I don't know if I observed it right there on the spot or not. I looked down at the pants. I seen what was on it. I picked the pants up and I asked who they belonged to."

\*     \*     \*     \*     \*     \*

Q. "And where did you find, excuse me, why did you pick up those pair of pants?"

A. "Well I was in there because of the individuals, the occupants of the residence at that time through leads that Detective Parsons had were suspects in this robbery. The occupants, they were four male occupants in the house and in that room they were all in a, different states of dress. I noticed that there's one like a, one picked up a jacket and discarded it immediately and then I observed these laying as the occupants were moving around, on the pile of clothes and the legs from about the knee down were wet. There was a large amount of blood on them which was observable here and I could see dark spots on the front of them which I would assume whoever assaulted Mr. Hammer would have blood stains on their clothing. So I picked them up and what observed to be blood spots at that time are faded now where it's hardly recognizable. The spots at that time appeared to be blood spots. Then the pants were wet and muddy as if someone had just removed them."

On cross-examination, Mertz stated:

Q. "Alright. The pair of pants that's been introduced that you found at the location at that time, where on your drawing here was that pair of pants located when you picked them up?"

A. "Okay. I was standing right here. When they was asked to accompany us to headquarters, like I said, the individuals were in different states of dress. One picked up a piece of clothing and discarded it immediately. He was acting very nervous. There were stacks of clothes. Just heaps of dirty clothes all over."

When the officers and Lance brothers departed for police headquarters, Sergeant Mertz took the trousers with him. The pants were admitted at trial over defendant's objection.

■ Initially, defendant argues that Mertz was not "rightfully" in the location from which he observed the trousers. Defendant suggests "it appears that whoever answered the door at the Defendant's residence did not contemplate that his 'invite' to Detective Parsons to come in would result in not one or two, but five policemen coming into the house." Parsons testified, however, that "We were asked to step inside the house." Defendant also challenges the propriety of Mertz's position on the basis that Mertz "went into the room away from the group of officers at the door by some eight feet or so." In short, defendant asserts that Mertz's position near the pile of clothes exceeded the consent granted to him. In some circumstances it might be said that an officer's ingress of eight feet subsequent to a general consent would constitute an intrusion violative of Fourth Amendment guarantees; that is not the case here, however. Mertz did not stray into rooms other than the one to which the threshold carried him; according to his testimony, Mertz assumed his position eight feet from the door to view the four suspects' movements and protect his fellow

officers. In light of these circumstances, including the violent nature of the crime under investigation, we do not believe the conduct of Sergeant Mertz was unreasonable and constituted an intrusion violative of defendant's Fourth Amendment rights. As Justice DeBruler stated in *Bruce v. State, supra* : "It is clear that the Constitution permits some intrusion into the personal privacy guaranteed by the Fourth Amendment upon less than probable cause." 268 Ind. at 230–31, 375 N.E.2d at 1069. Consequently, we conclude that Mertz was rightfully in his particular location in the living room.

Defendant argues, however, that even if Mertz's position was proper, his seizure of the trousers nevertheless violated the Fourth Amendment. He maintains the trousers lacked the readily apparent incriminating nature necessary to justify the seizure. *United States v. Gray, supra; Bruce v. State, supra.*

We agree with defendant that Mertz's examination of the trousers and determination that the dark spots thereon were bloodstains cannot be used to justify the seizure under the plain view doctrine. *Id.; Candler v. State, supra.* Mertz's determination that the dark spots were *in fact* bloodstains was obviously not readily apparent to him, for the fact was not established until he picked up the trousers and examined them. To utilize that information to justify the seizure would eliminate the inadvertence and "readily apparent" considerations which make the "plain view" seizure permissible.

Still, as the previously quoted testimony of Sergeant Mertz reveals, the trousers did bear readily apparent indications incriminating the defendant of the crime under investigation. Mertz had visited the scene of the crime earlier that evening. Due to the existing weather conditions and the blood-bespattered nature of the Hammer residence, he was aware that the clothing worn by the perpetrators would likely be wet, muddy and bloodstained. His curiosity was immediately piqued when, due to the somewhat furtive actions of the brothers,

he saw the wet, muddy trousers with dark stains atop the pile of dirty clothing. A nexus between the trousers and the crime which Mertz had investigated was readily apparent; his inadvertent discovery and seizure of the trousers cannot be characterized as unreasonable or in violation of the Fourth Amendment. *Coolidge v. New Hampshire, supra; United States v. Gray, supra; Bruce v. State, supra; Candler v. State, supra.* Consequently, the trial court did not err in admitting the trousers.

Finally, we note that in its brief, the state has recited "facts" concerning the seizure in the following manner: "Sergeant Dana Mertz saw the defendant notice blood on the pants he picked up to put on and toss them aside nervously (TR 169, 700)." Neither at pages 169 and 700 nor at any other location in the transcript does the record indicate that Mertz saw defendant pick up the pants or notice blood on them. Likewise, we are not enamored of the state's characterization of the blue jeans as "soaking wet with blood." The record reveals only wet and muddy pants with bloodstains. Practitioners may properly place the facts in a light most favorable to their client. Zealous representation, however, does not include a license to misrepresent or embellish the facts. Code of Professional Responsibility, D.R. 7–102(A)(5) (Burns 1980 Repl.).

## II.

Defendant's contention that the trial court erred in admitting the defendant's tape-recorded confession and transcription thereof is predicated on the "fruit of the poisonous tree" doctrine, as enunciated in *Wong Sun v. United States*, (1963) 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. He maintains that his confession was obtained as a result of the allegedly improper seizure of the trousers; the confession was consequently tainted and, under *Wong Sun v. United States, supra*, inadmissible, he asserts. Inasmuch as we have held the seizure of the trousers did not violate the Fourth Amendment prohibition against unreasonable searches and seizures, defendant's argument is without merit.

For all the foregoing reasons, there was no trial court error, and the judgment of the trial court should be affirmed.

Judgment affirmed.

GIVAN, C. J., and DeBRULER and PRENTICE, JJ., concur.

PIVARNIK, J., concurs in result.