James FAIR, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S04–9312–CR–1439.

Supreme Court of Indiana.

Dec. 30, 1993.

Andrew W. Swain, Indianapolis, for appellant.

Pamela F. Carter, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

ON PETITION TO TRANSFER

SHEPARD, Chief Justice.

We grant transfer to examine the rules applicable to inventory searches of automobiles under the Fourth Amendment to the U.S. Constitution. Concluding that the search in this case did not comply with the Fourth Amendment, we reverse.

## I. Facts and Procedural History

On October 13, 1991, Officer Jeffrey Wager of the Indianapolis Police Department was dispatched to the Vantage Point Apartment Complex in response to a complaint that gun shots had been fired. The police dispatcher advised Wager of a potential suspect described as a black male wearing a red baseball cap and blue or gray pants with a firearm of some kind. Upon arriving at the complex Officer Wager observed a man in the parking lot, later determined to be defendant James Fair, who fit this description. At the time, the suspect was placing a cylindrical object into the trunk of a car.

As Officer Wager pulled into the parking lot, he temporarily lost sight of Fair. When Wager reestablished contact, the trunk was closed, and Fair was standing beside the car. Wager pulled along side Fair and asked him to step away from the car and hold his hands where they could be seen. Fair complied, and Wager performed a pat-down search which turned up six 20–gauge shotgun shells. During the course of the encounter, Officer Wager formed the belief that Fair was a patron at a Vantage Point party to which he had been called earlier in the evening. He also concluded that Fair was intoxicated. At this juncture he arrested Fair for public intoxication, handcuffed him, and placed him in the back seat of his squad car.

Officer Wager then entered Fair's vehicle and searched its glove compartment. His stated purpose in doing this was to locate rental papers which would confirm Fair's claim that he had leased the car. After locating the rental papers, Wager decided to do an inventory search of the vehicle. While searching the interior of the car, he found a green leafy substance which he suspected was marijuana. After concluding that the

interior contained no other contraband or "property which needed to be noted," R. at 103, Wager decided that he wanted to look in the trunk. He obtained the keys from Fair and unlocked and opened the trunk, where he found a shotgun on top of some clothing.

The State charged Fair with possession of marijuana, a class A misdemeanor, Ind.Code Ann. § 35–48–4–11 (West 1986); public intoxication, a class B misdemeanor, Ind.Code Ann. § 7.1–5–1–3 (West 1982); and dealing in a sawed-off shotgun, a class D felony, Ind.Code Ann. § 35–47–5–4.1 (West Supp. 1993). The public intoxication and possession of marijuana counts were later dropped. Prior to trial Fair filed a motion to suppress evidence—the shotgun seized from the trunk. The trial court denied his motion after an evidentiary hearing. Fair was later convicted of the shotgun offense after a bench trial.

Fair's sole contention on appeal has been that the trial court erred in denying his motion to suppress the shotgun. At trial, the State conceded that Officer Wager did not have a warrant to search Fair's car, but persuaded the trial court to admit the shotgun on the theory that it had been discovered pursuant to a valid inventory search. Fair claims that the search did not attend a lawful impoundment and therefore the inventory was unreasonable in violation of the Fourth Amendment and Article I, Section 11 of the Indiana Constitution.[1] He also claims that the search was made in bad faith, a mere pretext for a criminal investigation. The majority of a divided Court of Appeals rejected these arguments and concluded that a proper inventory search had occurred. *Fair v. State* (1993), Ind.App., 615 N.E.2d 489. We disagree and reverse.

## II. Introduction to Inventory Searches

■ The Fourth Amendment to the U.S. Constitution, applicable to the states under the Fourteenth Amendment, requires that searches of private property be reasonable. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Montague v. State* (1977), 266 Ind.

51, 360 N.E.2d 181. This generally means the search must be authorized by a properly issued warrant. *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *Rabadi v. State* (1989), Ind., 541 N.E.2d 271. It is a "cardinal principle" in search and seizure jurisprudence that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)); *Montague*, 266 Ind. at 55, 360 N.E.2d at 185. When the prosecution seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing both the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception. *Mincey*, 437 U.S. at 390–91, 98 S.Ct. at 2412–13; *Robles v. State* (1987), Ind., 510 N.E.2d 660.

■ In *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the Supreme Court defined what has become known as the "inventory exception" when it held that the police may conduct a warrantless search of a lawfully impounded automobile if the search is designed to produce an inventory of the vehicle's contents. *See also Dixon v. State* (1982), Ind., 437 N.E.2d 1318. Because the police are performing an administrative or caretaking function rather than a criminal investigatory function when they impound an automobile, the Court declared that the policies underlying the Fourth Amendment's warrant requirement are inapplicable. *Opperman*, 428 U.S. at 370 n. 5, 96 S.Ct. at 3097 n. 5. Thus, the justification for an inventory search "does not rest on probable cause and . . . the absence of a warrant is immaterial to the reasonableness of the search." *Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983); *Rabadi*, 541

---

1. Because Fair provides no separate authority or argument that the search violated the Indiana Constitution, his Article I, Section 11 claim is deemed waived. *St. John v. State* (1988), Ind., 523 N.E.2d 1353.

N.E.2d at 274 ("Probable cause is not an issue in such inventory searches because of the non-criminal context in which they occur."). The inventory search is now considered a "well-defined exception to the warrant requirement." *Lafayette*, 462 U.S. at 643, 103 S.Ct. at 2608; *Foulks v. State* (1991), Ind., 582 N.E.2d 374, 376.

▇▇▇▇ As in all Fourth Amendment jurisprudence, the test of constitutionality in inventory cases is reasonableness. The First Circuit has observed that reasonableness has a protean quality which renders it more a concept than a constant, *United States v. Rodriguez–Morales*, 929 F.2d 780, 785 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992), such that it cannot be usefully refined "in order to evolve some detailed formula for judging cases." *Cady v. Dombrowski*, 413 U.S. 433, 448, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973). In determining the reasonableness of an inventory search, courts must examine all the facts and circumstances of a case. *Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100. This examination typically encompasses two overlapping sets of circumstances. First, the propriety of the impoundment must be established because the need for the inventory arises from the impoundment. Second, the scope of the inventory must be evaluated. Where either is clearly unreasonable, the search will not be upheld. In borderline cases, however, the ultimate character of the search is often most clearly revealed when both the necessitousness of the impoundment and the scrupulousness of the inventorying are viewed together.

### III. The Decision to Impound

▇▇ As we have said, the threshold question in inventory cases is whether the impoundment itself was proper. *Accord People v. Braasch*, 122 Ill.App.3d 747, 78 Ill.Dec. 67, 461 N.E.2d 651 (1984); *see also United States v. Young*, 825 F.2d 60, 61 (5th Cir. 1987) (finding inventory was reasonable "presupposes that the police had the right to

impound the vehicle"), *cert. denied*, 485 U.S. 1012, 108 S.Ct. 1483, 99 L.Ed.2d 711 (1988). Furthermore, "where the circumstances show that the police had no authority to impound the vehicle, or that police custodial care of the vehicle was not necessary, the inventory search was unlawful." Annotation, Inventory Search of Impounded Vehicles, 48 A.L.R.3d 537, 544 (1973) *quoted in State v. Jewell*, 338 So.2d 633, 638 (La.1976). Fair asks us to hold that police can properly impound a car only if their authority to do so is invoked by violation of a motor vehicle or forfeiture statute. In support of his argument, he observes that Indiana has numerous statutes authorizing the impoundment of motor vehicles.[2] While impoundment pursuant to such statutes is clearly proper, we agree with the Court of Appeals that statutory authority does not present the sole justification which courts will recognize, *Fair*, 615 N.E.2d at 491, inasmuch as impoundment is sometimes warranted by exigencies not cataloged in state statutes.

▇▇ The police are expected not only to enforce the criminal laws but also to aid those in distress, abate hazards, prevent potential hazards from materializing, and perform an infinite variety of other tasks calculated to enhance and maintain the safety of communities. The Supreme Court has recognized this multifaceted nature of policing and, in *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973) labeled it the "community caretaking function[ ]." This rubric is "a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities." *Rodriguez–Morales*, 929 F.2d at 785. Discharging these duties often involves handling automobiles, which constitute one of the most pervasive and regulated fixtures of modern life. *See Cady*, 413 U.S. at 441, 93 S.Ct. at 2528. Thus, in *Opperman* the Court observed that "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions,' . . . automobiles are frequently

---

**2.** *See, e.g.,* Ind.Code Ann. § 9–22–1–14 (West 1992) (authorizing towing of abandoned vehicles); § 9–21–16–4 (authorizing removal of vehicles found unattended on bridges, causeways, in

tunnels, or obstructing traffic); § 9–22–1–5 (authorizing impoundment of vehicle found in possession of person other than owner when that person cannot establish right to possession).

taken into police custody." 428 U.S. at 368, 96 S.Ct. at 3097 (citation omitted).

In the *Cady* case the Court found the towing from a rural stretch of road of a rental car disabled in an accident was consonant with the community caretaking function. Writing for the Court, Justice Rehnquist defended the impoundment noting that "there is no suggestion in the record that the officers' action in exercising control over [the car] by having it towed away was unwarranted either in terms of state law *or sound police procedure.*" 413 U.S. at 447, 93 S.Ct. at 2531 (emphasis supplied). In *Opperman,* the vehicle at issue was impounded for multiple parking violations. As in *Cady,* the Court felt no need to cite any specific statute authorizing such a towing. Instead, it enumerated several scenarios illustrative of community caretaking, including the presence of disabled or damaged vehicles or vehicles which violate parking ordinances, and concluded that "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." 428 U.S. at 369, 96 S.Ct. at 3097.

■■■ From this we conclude that, as a matter of federal constitutional law, the police may discharge their caretaking function whenever circumstances compel it. *Accord United States v. Ibarra,* 955 F.2d 1405, 1408 (10th Cir.1992) (*Opperman* permits impoundment of cars which "threaten public safety" even where no statutory authorization exists); *Riley v. State,* 583 So.2d 1353, 1355 (Ala.Crim.App.1991) ("the police have an inherent authority to impound vehicles, aside from statutory authority based on what is called the community caretaking function.") (quoting *Morton v. State,* 452 So.2d 1361, 1365 (Ala.Crim.App.1984)); *cf. State v. Johnson,* 745 P.2d 452, 454 (Utah 1987) ("[T]he existence or absence of justification for the impoundment of an automobile may be determined from the surrounding circumstances."). An impoundment, then, will not be invalidated solely because it was not specifically authorized by statute so long as the State can demonstrate it was warranted in terms of the community caretaking function.

When confronted with this question, many courts have seized on the Supreme Court's statement in *Colorado v. Bertine* that an officer's discretion to impound must be "exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." 479 U.S. 367, 375, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987). This focus on "standard criteria" has a parallel in the more common scope-of-inventory challenges where reasonableness is usually determined by whether there was compliance with "standard police procedures." *Opperman,* 428 U.S. at 372, 96 S.Ct. at 3098–99. Because compliance tends to indicate that the inventorying was limited to that necessary to carry out the caretaking function, where compliance exists searches are usually upheld. *Cf. id.* at 374–75, 96 S.Ct. at 3099–3100. By analogy, some courts have held that the reasonableness of an officer's conclusion that a vehicle posed a threat to the community hinges on whether that conclusion was reached in accordance with standard police department regulations. *See, e.g., People v. Toohey,* 438 Mich. 265, 475 N.W.2d 16, 23, 25 (1991).

We note that the "standard criteria" passage quoted from *Bertine,* however, relates to police discretion in choosing *between* impounding a vehicle, parking and locking it in a public parking place, or allowing a third party to take custody. *Bertine,* 479 U.S. at 375, 107 S.Ct. at 743, and 479 U.S. at 379–380, 107 S.Ct. at 745 (Marshall, J., dissenting). It does not address an officer's initial decision as to whether the vehicle needed to be dealt with at all. It is altogether reasonable to expect the mechanics of the several methods available for dealing with vehicles which constitute hazards to be set out in departmental regulations or routine. On the other hand, the myriad circumstances under which a vehicle is reasonably viewed as posing a hazard could not possibly be cataloged in advance or meaningfully summarized. *See Rodriguez–Morales,* 929 F.2d at 787 ("The police cannot sensibly be expected to have developed, in advance, standard protocols running the entire gamut of possible eventualities.").

Notwithstanding this need for flexibility, it must also be said that when the impoundment is not specifically directed by state law, the risk increases that a decision to tow will be motivated solely by the desire to conduct an investigatory search. *See generally* 3 Wayne R. LaFave, *Search and Seizure* § 7.5(e), at 142 (2d ed. 1987) ("[T]he police might impound a car which they otherwise would not impound ... for the purpose of gaining an opportunity to look for evidence."). This potential is problematic given that the community caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441, 93 S.Ct. at 2528. Accordingly, a sound approach to evaluating police decisions to impound should both accommodate the multiformity of hazards with which they must deal and succeed in ferreting out those impoundments which are a mere pretext for other, improper objectives.

▆▆▆▆ In light of these considerations, we hold that to prevail on the question of whether an impoundment was warranted in terms of the community caretaking function, the prosecution must demonstrate: (1) that the belief that the vehicle posed some threat or harm to the community or was itself imperiled was consistent with objective standards of sound policing, *Cady*, 413 U.S. at 447, 93 S.Ct. at 2531; *cf. Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100, and (2) that the decision to combat that threat by impoundment was in keeping with established departmental routine or regulation. In administering this standard, courts should be mindful that the Fourth Amendment does not necessarily require police to utilize the least intrusive means to secure and protect an automobile. *Bertine*, 479 U.S. at 373–374, 107 S.Ct. at 742; *see also State v. Wells*, 539 So.2d 464 (Fla.1989), *aff'd*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). The question, then, is not whether there was an absolute need to dispose of the vehicle but whether the decision to do so was reasonable in light of the applicable standard. *See United States v. Brown*, 787 F.2d 929 (4th Cir.), *cert. denied*, 479 U.S. 837, 107 S.Ct. 137, 93 L.Ed.2d 80

(1986); *cf. State v. Smith*, 120 Idaho 77, 813 P.2d 888 (1991); *Toohey*, 475 N.W.2d at 23 ("courts need not second-guess a police officer's exercise of professional judgment regarding impoundment of an automobile").

In this case, the State has made no effort to demonstrate that any Indiana statute authorized Officer Wager's impoundment of Fair's vehicle. A much closer question is whether reasons of public safety dictated that the car be towed. With the advent of the inventory search, courts have had numerous opportunities to pass on which potential threats satisfy this requirement. The needs of the community have been held to be implicated where the arrest of the driver left his car unattended on a public highway, *Rodriguez–Morales*, 929 F.2d at 785; *United States v. Velarde*, 903 F.2d 1163 (7th Cir. 1990); *United States v. Griffin*, 729 F.2d 475 (7th Cir.), *cert. denied*, 469 U.S. 830, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984); where the ownership of the vehicle cannot be established, *Young*, 825 F.2d at 60; *Madison v. United States*, 512 A.2d 279 (D.C.1986); and where the vehicle was on private property and the owner of the property requested removal, *Fitzgerald v. State*, 201 Ga.App. 361, 411 S.E.2d 102 (1991).

The instant impoundment is of a different sort. Before us we have an undamaged vehicle neatly parked in a relatively secure private parking facility. There had been no complaint from the owners of the property, and there was no unqualified driver in whose possession the car would be left if the officer did not act. The driver's lawful possession of the vehicle was not in doubt. Instead, it was Officer Wager's testimony that the vehicle required police attention because, if left where it was, "it might be damaged." R. at 112. This case, then, is typical of a distinct class of inventory cases in which the *sole* justification for impoundment is that the defendant's vehicle, left unattended on private property as a result of a custodial arrest, will be exposed to theft or vandalism or might otherwise become a nuisance. *See, e.g., Delgado v. State*, 718 S.W.2d 718 (Tex.Crim.App. 1986). These cases have spawned diverse

holdings[3] which reflect the difficulty inherent in any judicial effort to determine when the threat posed by or to a vehicle is so insignificant than an overly cautious officer's decision to seize it is simply not reasonable.

■ The Attorney General rightly points out that we do not here write on a clean slate. We had before us a similar case in *Johnson v. State* (1990), Ind., 553 N.E.2d 477, where defendant's car was impounded from the parking lot of an apartment complex at which he did not reside. The facts and holding of *Johnson* point the way to the correct resolution of this case. In particular, we think *Johnson* stands for the proposition that two primary factors should be considered in determining whether the conclusion that vehicles such as Fair's constitute a hazard is reasonable in light of objective standards of sound policing. The first is the degree to which the property upon which the vehicle is situated was under the control of the defendant. *See Johnson*, 553 N.E.2d at 479. Clearly, for example, there is a difference between a vehicle left in the driveway of a defendant's parent's home and one left in a small lot intended for unloading air cargo. *See People v. Krezen*, 427 Mich. 681, 397 N.W.2d 803 (1986). Second, the length of time the impounding officer perceived the car would be unattended is important. It helps assess the reasonableness of the officer's conclusion that the vehicle, if left alone, would be exposed to an unacceptable risk of theft or vandalism.[4]

■ With these understandings in place, we now turn to the ruling here at issue. It is well established in Fourth Amendment jurisprudence that a trial court's factual findings will not be overturned unless clearly erroneous. *See, e.g., United States v. Guglielmo*, 834 F.2d 866 (10th Cir.1987). The ultimate determination of reasonableness, however, is not a factual finding but a constitutional legal question meriting independent consideration. *Ibarra*, 955 F.2d at 1409; *cf. Light v. State* (1989), Ind., 547 N.E.2d 1073. In undertaking this consideration, we examine the evidence favorable to the trial court's decision, with all disputes resolved in favor of the ruling, as well as any uncontested evidence favorable to the appellant. *Lance v. State* (1981), Ind., 425 N.E.2d 77; *Whitt v. State* (1977), 266 Ind. 211, 361 N.E.2d 913. In this sense, the standard of review differs from the typical sufficiency of the evidence case where only evidence favorable to the verdict is considered. *Light*, 547 N.E.2d at 1076.

■ In the *Johnson* case no link was established between the situs of the vehicle and the defendant. *Johnson*, 553 N.E.2d at 478. At the time that impoundment was ordered, the arresting officer knew the defendant would likely be charged with multiple, serious felonies. *Id.* In the instant case, it is undisputed that Fair's car was parked at an apartment complex where he was a tenant's invited guest. His car was parked between the lines and did not impede traffic. At the suppression hearing, the

---

3. *Compare Brown*, 787 F.2d at 932 (impoundment reasonable where vehicle could present nuisance if left in business parking lot "until the next day or longer"); *United States v. Johnson*, 734 F.2d 503 (10th Cir.1984) (impoundment reasonable where vehicle could be subject to vandalism if left in lounge parking lot); *United States v. Staller*, 616 F.2d 1284, 1289–90 (5th Cir.) (impoundment reasonable where vehicle would be left unattended in mall parking lot "possibly for an extended period of time"), *cert. denied*, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980) *with State v. Rice*, 717 P.2d 695 (Utah 1986) (impoundment unreasonable where vehicle safely locked in parking lot behind law office); *Manalansan v. State*, 45 Md.App. 667, 415 A.2d 308 (Md.Ct.Spec.App.1980) (impoundment unreasonable where auto left at rest in legitimate parking spot); *Riley v. State*, 583 So.2d 1353 (Ala.Crim. App.1991) (same).

4. The Court of Appeals concluded that "by reason of Fair's arrest for public intoxication, Officer Wager had a right and a duty to impound his car." *Fair*, 615 N.E.2d at 491. While the probable length of any period of initial incarceration and the location of the car during this period are highly relevant to our inquiry, we agree with Judge Miller's dissent that the mere fact of a custodial arrest had no magical significance. For instance, when a arrestee's car is parked on his own property, an impoundment would rarely if ever be warranted in terms of community caretaking. *Johnson*, 553 N.E.2d at 479. The case of *Eckstein v. State* (1988), Ind., 526 N.E.2d 693, on which the Court of Appeals relies, is inapposite, involving not an automobile but a bicycle bag.

apartment complex manager testified that the area in which Fair was parked was reserved for guests of tenants. Moreover, he indicated that he would not seek to have even a *non-guest's* car towed from that area unless it was "causing a disturbance" or "blocking an entrance or something."[5] R. at 72. Thus, while Fair's car was not located at his own home, the permissibility of it remaining at the complex was in the hands of his acquaintances.

When Officer Wager resolved to impound Fair's car he knew only that Fair would be charged with public intoxication. Indiana Code Ann. § 12–23–15–1 (West Supp.1993) specifies that when an individual is arrested for public intoxication and is not "unmanageable" or "causing damage," the officer may simply issue a citation and take the individual to a responsible person or relative willing to provide care. This authorization reveals the likelihood that Fair would have been released on his own recognizance or on nominal bond within a very brief time and would then have been able to reclaim his car. *See Manalansan*, 415 A.2d at 311; *cf. United States v. Kornegay*, 885 F.2d 713, 716 (10th Cir.1989) ("[The agents had every reason to believe that [the defendant] would not be returning anytime soon to the ... lot."), *cert. denied*, 495 U.S. 935, 110 S.Ct. 2179, 109 L.Ed.2d 508 (1990); *United States v. Young*, 825 F.2d 60 (5th Cir.1987) (same).

In short, there is little in this record to establish that Fair's vehicle constituted a potential hazard with which Wager reasonably felt the need to deal. In making this statement, we do not mean to be understood as saying that it would never be reasonable to tow an arrestee's neatly parked vehicle from private property in the absence of a complaint from the owner. Rather, it is the case that on facts such as these, the State's bur-

den is not met solely by the introduction of an officer's generalized assertion that he has a duty to safeguard the vehicles of those with whom he comes into contact.[6] We would probably indulge the reasonableness of this impoundment but for the indicia of pretext which litter the record of this "inventorying" and the absence of evidence about any departmental procedures against which we might evaluate their significance.

### IV. The Scope of the Inventory

Even the lawful custody of an impounded vehicle does not of itself dispense with the constitutional requirement of reasonableness in regard to the searches conducted thereafter. Instead, to pass constitutional muster, the search itself must be conducted pursuant to standard police procedures. *Bertine*, 479 U.S. at 375, 107 S.Ct. at 743. The rule that standardized criteria or established routine must exist as a precondition to a valid inventory search is designed to ensure that the inventory is not a pretext "for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990). In order to perform this function, the procedures must be rationally designed to meet the objectives that justify the search in the first place, *Isom v. State* (1992), Ind.App., 589 N.E.2d 245, and must sufficiently limit the discretion of the officer in the field. *Wells*, 495 U.S. at 4, 110 S.Ct. at 1635; *People v. Galak*, 80 N.Y.2d 715, 594 N.Y.S.2d 689, 610 N.E.2d 362 (1993). Searches in conformity with such regulations are reasonable under the Fourth Amendment. *Opperman*, 428 U.S. at 376, 96 S.Ct. at 3100. Thus, to defeat a charge of pretext the State must establish the existence of sufficient regulations and that the search at issue was conducted in conformity with them.

---

5. Under Ind.Code Ann. §§ 9–22–1–15, 16 (West 1992), the owner of rental property may have an "abandoned" vehicle towed therefrom but must first give 72 hours notice.

6. Officer Wager's only testimony on the subject of the necessity of impounding Fair's vehicle was as follows:
   Q. You referred to the Indianapolis Police Department inventory search regarding the trunk and other portions of a car. Can you briefly explain what that—what the Indianapolis Police Department policy is regarding inventory searches.
   A. O.K. If we come into contact with someone who has a vehicle uh—we are to safe guard that vehicle. We're not allowed—we should not leave it anywhere where it might be damaged. So therefore they request we inpound [sic] those vehicle....
   R. at 111–12.

We noted earlier that in borderline cases where the impounded vehicle presented only a marginal threat the ultimate character of the transaction is often revealed by the manner in which the search was conducted. The record of this search presents several indicia of pretext which raise a question about whether it was conducted in good faith. The search was conducted not at the impoundment lot but at the scene of the crime. *See State v. Badgett*, 200 Conn. 412, 512 A.2d 160 (1986); *State v. Jewell*, 338 So.2d 633 (La.1976). The inventory was conducted by an officer responsible for criminal investigations and not the custody of impounded property. *See Rabadi*, 541 N.E.2d at 275. There is no evidence that formal inventory sheets were completed. *See Jewell*, 338 So.2d at 639; *Galak*, 610 N.E.2d at 365. The officer apparently did not make note of Fair's personal affects, *see* R. at 116 & State's Exhibit 6, but instead focused only on the contraband. *See Badgett*, 512 A.2d at 171; *Manalansan*, 415 A.2d at 311. Finally, it is not even clear from the record that the car actually ever was impounded. While any one of these facts probably would not render the search constitutionally defective, collectively they are very harmful to the State's position.[7]

The fatal defect in this search is that the provisions of the Indianapolis Police Department's inventory policy are not established in sufficient detail by the record. Officer Wager testified *only* that "we conduct an inventory search of the car to see what kind of items are in it. If there's anything valuable that might need to be placed in the property room or otherwise noted as being in the car."

R. at 112. There was no testimony whatsoever that provided the particulars of the policy and, therefore, it is not possible for this Court to determine whether the seemingly suspicious circumstances which attended the search were in fact irregular. Without more, then, we can not conclude that the police department's inventory search was reasonable.[8] *See Ex Parte Boyd*, 542 So.2d 1276 (Ala.), *cert. denied*, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989); *Galak*, 610 N.E.2d at 365–66; *cf. Rabadi*, 541 N.E.2d at 275 ("The circumstances surrounding the intrusion must also indicate that the search was part of established and routine department procedures.").

The State did not carry its burden of establishing that the search of Fair's car was reasonable and not a mere pretext. We reverse the conviction and direct the trial court to grant Fair's motion to suppress. The case is remanded for possible retrial.

DeBRULER, DICKSON and SULLIVAN, JJ., concur.

GIVAN, J., dissents with separate opinion.

GIVAN, Justice, dissenting.

I respectfully dissent from the majority opinion in this case. The facts set out in the majority opinion indicate probable cause for the officer to make an inventory search of the vehicle. The officer had been called to the Vantage Point Apartment complex in response to a complaint that shots had been fired.

**7.** Fair makes much of the fact that, by his own testimony, Officer Wager expected to find a gun when he resolved to inventory the vehicle. An officer's suspicion that evidence may be present, however, is not automatically fatal to a search, *United States v. Porter*, 859 F.2d 83 (8th Cir. 1988), so that as long as the impoundment is pursuant to the community caretaking function and is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives is permissible. *Rodriguez–Morales*, 929 F.2d at 787. Moreover, the reasonable belief that a vehicle holds a dangerous weapon may, in itself, actually warrant impoundment. *See Cady*, 413 U.S. at 447, 93 S.Ct. at 2531. It was not, however, Officer Wager's testimony that such a belief motivated his decision to impound, R. at

111, so the very issue here is the existence of a caretaking motive.

**8.** The need for a better developed record is all the more real in this case where the evidence at issue was located in a locked trunk. The reasonableness of extending an inventory search to a locked trunk has been a point of some contention, *see generally State v. Prober*, 98 Wis.2d 345, 297 N.W.2d 1 (1980) (listing competing approaches to this problem), and the propriety of doing so now appears to turn on whether the practice is regulated by some articulated policy. *See Bertine*, 479 U.S. at 375, 107 S.Ct. at 743; *cf. State v. Hathman*, 65 Ohio St.3d 403, 604 N.E.2d 743 (1992).

When he arrived, he observed appellant placing a cylindrical object in the trunk of the car. He approached appellant and in a pat-down search found six 20–gauge shotgun shells. He also determined that appellant was intoxicated. Appellant informed him that the automobile was a rental automobile. In order to verify this, the officer looked in the glove compartment of the car for the rental papers. He then conducted an inventory search of the automobile.

In view of the reason for the officer being at that location, his observation of appellant placing an object in the trunk of the car and his discovery of shotgun shells on appellant's person gave him reason to believe that appellant was the person who had been firing shots. At that time, the officer, of course, could not know what the effect of the firing of those shots had been. This situation alone was sufficient to conduct an inventory search under the authority of the several cases cited in the majority opinion.

Further, upon the discovery that appellant was intoxicated it was proper for the officer to take appellant into custody. Although the automobile was properly parked in a private parking lot, it was not the home of appellant. When appellant told the police officer the car was a rental automobile, the officer had a duty to take steps to protect the owner's property.

Here again, under the several cases cited in the majority opinion, there was ample reason, in fact, a duty of the police officer to protect the owner's rights in the automobile. I believe there were two substantial grounds upon which to justify an inventory search of this automobile.

The majority opinion of the Court of Appeals, reported at 615 N.E.2d 489, is a correct analysis of this situation.

I would deny transfer in this case.