**UNITED STATES of America,
Plaintiff,**

v.

**Fushaun COOLEY, Defendant.**

**No. 2:00–CR–152–RL.**

United States District Court,
N.D. Indiana,
Hammond Division.

Oct. 25, 2000.

---

AUSA Randall M. Stewart, U.S. Attorney's Office, Dyer, IN, for plaintiff.

Ray L. Szarmach, Zarmach and Fernandez, Merrillville, IN, for defendant.

## ORDER

LOZANO, District Judge.

This matter is before the Court on the Motion to Suppress and Motion Requesting Evidentiary Hearing filed by Defendant, Fushaun Cooley, on September 15, 2000. For the reasons set forth below, this motion is GRANTED. The Court ORDERS that all evidence found during the inventory search of Fushaun Cooley's car, including the SKS rifle with magazine in the trunk and the shotgun shell in the glove compartment, be SUPPRESSED.

### BACKGROUND

On February 28, 2000, the police arrested Defendant, Fushaun Cooley, for disorderly conduct following a traffic stop. The police impounded Cooley's car and inventory searched it, finding an SKS rifle in the trunk and a shotgun shell in the glove compartment. Cooley was subsequently charged in a one-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Cooley has now filed a motion to suppress, arguing that all evidence found in his car pursuant to the inventory search was improperly seized following the unlawful impoundment of his car. The Court held an evidentiary hearing on this matter on September 28, 2000, and has subsequently reviewed the tape of this hearing.[1] Having considered the credibility of the witnesses, the evidence admitted during the hearing, and the supplemental arrest report jointly submitted by the parties,[2] the Court makes the following findings of fact.

### FINDINGS OF FACT

At approximately 9:30 p.m. on February 28, 2000, the Defendant, Fushaun Cooley, was driving his 1986 Chevy Caprice north on Guthrie Street in East Chicago, Indiana. His friend, Jacqueline Boyette, was riding in the front passenger seat and the only other person in the car. Cooley turned right on Washington Street without using a turn signal. Officers Juan Maldonado and Luis Semidei of the East Chicago Police Department, both in uniform and in marked patrol cars, noticed Cooley make the turn without signaling and proceeded to stop him for failing to use his turn signal. Semidei, with Maldonado following, pulled Cooley over directly after Cooley turned onto Washington Street. After Cooley was pulled over, all three cars were parked along Washington Street about five car lengths from Guthrie Street, with Maldonado parked directly behind Semidei who was parked directly behind Cooley.

While Semidei radioed in the traffic stop to dispatch, Maldonado exited his car and approached Cooley's car. At this time, Maldonado noticed that one of Cooley's license plate lights was not illuminated and that Cooley was not wearing a seat belt. By the time Maldonado reached the driver side window of Cooley's car, Semidei had finished radioing in the traffic stop and positioned himself at the passenger side rear corner of Cooley's car to watch for any suspicious movements from Cooley or Boyette.

When Maldonado approached Cooley's driver side window to explain to Cooley, still in his car, why he had been pulled over, Cooley immediately began yelling that the police had "no fucking reason" to stop him and that he knew "his fucking rights." While Cooley was yelling he was raising his hands above his head in an animated way. Maldonado asked Cooley to quiet down and requested to see his driver's license and registration, but Cooley disobeyed, continuing to shout profanity while stating that he knew his rights

---

1. To date, no transcript of this hearing has been prepared.

2. This supplemental arrest report was not available at the time of the evidentiary hearing but was later jointly submitted to the Court by the parties for the Court's consideration in ruling on the motion to suppress.

and that the police had no reason to stop him. Maldonado advised Cooley to calm down several more times and again asked for Cooley's license and registration, but Cooley refused, continuing to shout at Maldonado. Cooley also disobeyed Boyette's request for him to quiet down and her request for him to give Maldonado his license and registration.

At this point, Maldonado requested Cooley step out of his vehicle, which Cooley did while continuing to yell that he knew his rights and that the officers had no reason to stop him. A number of people in the surrounding area began congregating within earshot. When Cooley continued to yell at Maldonado while still failing to provide a license or registration, Maldonado placed Cooley under arrest for disorderly conduct. Maldonado handcuffed Cooley and placed him in the back of his police car. Cooley did not physically resist being arrested. In the course of being placed in the squad car, Cooley stated to Maldonado that he was a convicted felon and also that he wanted Boyette to take custody of his car. During the entire incident, Cooley never provided the police with his license or registration.

While Maldonado was arresting Cooley, Semidei had Boyette step out of the car. He asked her for identification, but she did not have a driver's license or any other identification with her. After she told him her name and date of birth, he confirmed that no outstanding warrants for her arrest existed. Semidei then asked her where she lived, and she responded that she lived only 1–1/2 blocks away. When Semidei confirmed her address with the results of the warrant check, he stated that she was free to go on her way.

At this point, Officer Juda Parks of the East Chicago Police Department arrived on the scene to make sure the situation was under control. When he stepped out of his car, he was approached by Boyette, who asked him if she could take custody of Cooley's car. Boyette was at least twenty-six years old and physically appeared old enough to drive. Without discussing the matter with either Maldonado or Semidei, Parks told Boyette that she could not take Cooley's car. Parks then offered Boyette a ride home, which she accepted.

The police then impounded Cooley's car pursuant to the oral policy by which all officers are trained in the East Chicago Police Department. This impoundment policy is as follows. When the driver of a car is arrested, the police are to impound the car unless a co-owner, meaning another person whose name is on the title, is present to take custody of the car. While this specific impoundment policy itself is not a written policy, it is based on the written Standard Operating Procedure 203.15 which states that "[a]ny member of the force who has at any time the custody of any person or persons under arrest or detention shall be responsible for the proper safeguard of such person or persons and their property for the period of time they remain in his custody." Every East Chicago police officer receives a written copy of this standard operating procedure. The East Chicago Police Department's stated reason for its impoundment policy is that it would be held liable if an arrestee's car were turned over to a non-owner who damaged the car, in addition to being liable if an arrestee's car were left on the street and stolen or vandalized. An officer would be reprimanded by his superior if he failed to follow this impoundment policy.

Boyette was not listed as a co-owner on the title for Cooley's car. For this reason, the police officers would not have let her take custody of the car even if she had a valid driver's license with her. The officers were uncertain as to whether Cooley's car, as it sat in the position it had been pulled over by Cooley on Washington Street, was lawfully parked. Even if it had been lawfully parked, the officers would have still impounded the car pursuant to their policy to protect the car from theft or vandalism. The area in which the car had been pulled over is a high crime area of East Chicago.

Pursuant to the car's impoundment, Maldonado then conducted an inventory search of the car in accordance with the standard procedure of the East Chicago Police Department to collect and list all valuables inside of impounded vehicles. In the course of this search, Maldonado found a shotgun shell inside the closed, unlocked glove compartment of Cooley's car. He also found an SKS assault rifle with magazine in the locked trunk of the car. Neither of these items were in plain view before Maldonado inventoried the car. The officers did not know Cooley before the traffic stop and had no reason to suspect that any contraband was in his car prior to the inventory search.

After inventorying the car, Maldonado took Cooley to jail for processing while the car was towed. Cooley was released on bond the following day.

*CONCLUSIONS OF LAW*

██ As an initial matter, the Court finds the officers lawfully stopped and later arrested Cooley. Concerning the traffic stop, the decision to stop a vehicle is reasonable where the police have probable cause to believe a traffic violation has occurred. *See, e.g., Whren v. United States,* 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Williams,* 106 F.3d 1362, 1365 (7th Cir. 1997). Upon witnessing Cooley commit the traffic violation of failing to signal, Ind.Code § 9–21–8–25 (1992), when he turned right onto Washington Street, the police clearly had probable cause to believe a traffic violation had occurred. Indeed, probable cause only requires a substantial chance of a violation, not an actual showing of such activity. *See, e.g., United States v. Lima,* 819 F.2d 687, 688 (7th Cir.1987); *see also Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (noting that the probable cause determination does not even require that an officer's belief be more likely true than false). Concerning the arrest, when Cooley continued to yell at Maldonado after being repeatedly asked to quiet down, Maldonado lawfully arrested him for disorderly conduct. Under Indiana law, the class B misdemeanor of disorderly conduct is defined to include knowingly continuing to make unreasonable noise after being asked to stop, Ind.Code § 35–45–1–3 (1998); *Price v. State,* 622 N.E.2d 954, 967 (Ind. 1993), and as a misdemeanor it is an arrestable offense when committed in the presence of a police officer, Ind.Code § 35–33–1–1(a)(4) (1998). Thus, the officers' actions up through Cooley's arrest were lawful.

██ Concerning whether Cooley's car was lawfully impounded, the Court finds that the Seventh Circuit's decision in *United States v. Duguay,* 93 F.3d 346 (7th Cir.1996), *reh'g denied,* compels the conclusion that the impoundment was improper. In this regard, the Court notes that it has not only thoroughly considered the arguments of both Cooley and the Government concerning *Duguay*'s application but also conducted its own exhaustive search of the case law on the impoundment issue.

In *Duguay,* Gloria Vaughn drove a car, in which Christopher Duguay was a passenger, into an Alton, Illinois parking lot. *Id.* at 348–49. The police recognized Duguay as associated with a drug trafficker and approached him for questioning. *Id.* at 349. Duguay became combative and was arrested for assault. *Id.* After being handcuffed, he told Vaughn not to surrender the keys. *Id.* The police informed Vaughn that the car would have to be impounded and demanded the keys. *Id.* When Vaughn refused to surrender the keys, she was arrested for obstruction of justice, and the police retrieved the car keys from her. In inventorying the car following its impoundment, the police found a substantial quantity of crack cocaine. *Id.* After the district court denied Duguay's motion to suppress the crack, Duguay was found guilty of drug distribution and possession of weapons. On appeal, the Seventh Circuit reversed the district court's denial of his suppression motion, finding that the car was improperly impounded not only be-

cause the police did not have a standardized procedure for impounding vehicles but also because the police rationale for impounding the car was not constitutionally legitimate. *Id.* at 351–54.

Regarding the rationale for impounding the car, the Alton Police Department impounded all vehicles after the person in control of the vehicle or the owner was arrested not only for the protection of the owner of the vehicle but also for the liability purposes of the police. *Id.* at 352. The police department reasoned that if it had left the vehicle in the parking lot after arresting the owner or person in control of it, the police would be held liable if the vehicle were vandalized or stolen. *Id.*

In rejecting this rationale, the Seventh Circuit stated that in the "leading case" *of South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the Supreme Court held that in the absence of probable cause to believe it involved in a crime, a vehicle may only be impounded consistent with the police role as "caretaker" of the streets. *Duguay,* 93 F.3d at 352. The Seventh Circuit went on to construe *Opperman* such that this "community caretaking" or "public safety" function included such duties as "removing 'disabled or damaged vehicles,' and 'automobiles which violate parking ordinances, and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic.'" *Id.* (quoting *Opperman,* 428 U.S. at 368–69, 96 S.Ct. 3092). The Seventh Circuit stressed that such caretaking functions are "distinct" from the permissible reasons for conducting an inventory search of the contents of an impounded vehicle, "which are 'to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" *Id.* (quoting *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987)). Thus, in distinguishing the legitimate purposes of impoundment from the reasons for inventorying contents after impoundment, the Seventh Circuit held that the Alton Police Department's rationale for

impounding the car to protect itself from liability in the event the car was vandalized or stolen was unreasonable. *Id.* "While protection of the arrestee's property and municipal liability are both valid reasons to conduct an inventory after a legal impoundment, they do not establish the *a priori* legitimacy of the impoundment." *Id.*

The court then stressed exactly why the impoundment rationale of protecting the car from theft or vandalism was invalid from a police perspective of avoiding liability:

> The police do not owe a duty to the general public to remove vulnerable automobiles from high-crime neighborhoods. The Illinois Local Government Tort Immunity statute does not impose a duty on the police to protect the property of individuals from tort or crime. *See* 745 ILCS 10/4–102 ("Neither a local public entity nor a public employee is liable for . . . failure to prevent commission of crimes."); *see also Bank of Illinois v. Over,* 65 F.3d 76, 77 (7th Cir. 1995). Similarly, the police owe no duty to incarcerated persons to protect personal property from private injury. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).
>
> As for avoiding civil liability, it is clear that impounding the car increased the City of Alton's potential exposure. The state owes no legal duty to protect things outside its custody from private injury. *Cf. DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *J.O. v. Alton Community Unit School Dist. 11,* 909 F.2d 267, 272 (7th Cir.1990). As there is no tort for omissions by state actors, the assertion of custody over Duguay's automobile could only increase the risk of liability.

*Id.* at 352–53. Accordingly, the court held the Alton Police Department's liability rationale for impoundment improper. *Id.*

The Seventh Circuit further held that the impoundment of the car without re-

gard to whether Duguay could provide for its removal was "patently unreasonable" if the ostensible purpose for impoundment is the caretaking of the streets. *Id.* at 353. Thus, the police's actions were also improper in this regard because the officers impounded the car without consideration of whether Gloria Vaughn or Duguay's brother in the nearby crowd could have taken control of the car. *Id.*

Returning to the instant case, the Court first finds that, in contrast to the Alton police in *Duguay*, the East Chicago Police Department has a standardized procedure to impound any car in which the driver is arrested unless a co-owner, meaning another person whose name is on the title, is present to take custody of the car. While this impoundment policy itself is not in writing, the lack of a written policy is not dispositive. *Id.* at 351. Because both Maldonado and Semidei testified credibly and consistently as to East Chicago's established impoundment policy, and because it is rooted in a written policy (Standard Operating Procedure 203.15), the Court finds the impoundment policy sufficiently standardized to meet the requirements of the Fourth Amendment. *Id.*

That said, the Court finds that it is bound by *Duguay* in finding that East Chicago's rationale for its impoundment policy—to protect vehicles from vandalization, theft, or damage in the hands of non-owners and thereby avoid liability—is unreasonable under the Fourth Amendment. As the Seventh Circuit in *Duguay* found in Illinois, this Court similarly finds that Indiana does not impose a duty on the police to protect the property of individuals from tort or crime. *See, e.g., Turner v. Sheriff of Marion County*, 94 F.Supp.2d 966, 978 (S.D.Ind.2000); *Benton v. City of Oakland City*, 721 N.E.2d 224, 227–228 (Ind.1999). Furthermore, both the Government and Cooley have informed the Court that they are unaware of any law under which the East Chicago Police Department would be held liable for damage to an arrestee's property when that property had not been impounded or otherwise taken into custody by the police.

In addition, the Court has been unable to find any case law subsequent to *Duguay* in any jurisdiction that would undermine the Seventh Circuit's reasoning in reaching the conclusion that it is unreasonable to base an impoundment policy on protecting an arrestee's property for the purpose of avoiding liability. The Court notes the Government's citation to the Indiana Court of Appeals' recent decision in *Peete v. State*, 678 N.E.2d 415 (Ind.Ct.App.1997), where the court noted the Indiana Supreme Court's 1993 pronouncement in *Fair v. State*, 627 N.E.2d 427 (Ind.1993), that impoundment may be justified if a vehicle itself is imperiled, *id.* at 433. *Peete*, 678 N.E.2d at 420. However, *Fair* was decided before *Duguay*, and this Court must presume that in deciding *Duguay* the Seventh Circuit rejected *Fair*'s reading of Supreme Court authority on impoundment in the same way that it rejected the similar positions of *United States v. Ramos–Morales*, 981 F.2d 625, 627 (1st Cir.1992), *United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir.1980), *United States v.. Balanow*, 528 F.2d 923, 924 (7th Cir.1976), and *Cabbler v. Superintendent*, 528 F.2d 1142, 1145–46 (4th Cir.1975), all cited by the dissent in *Duguay*. *Duguay*, 93 F.3d at 355 (Kanne, J., dissenting). Indeed, in pronouncing its decision in *Duguay*, the Seventh Circuit noted that it had conducted a "careful review of the large body of case law on inventory searches and the considerably smaller number of cases on impoundment." *Id.* at 351. Thus, this Court must presume that the Seventh Circuit has rejected, not overlooked, the arguably large body of authority in opposition to its reading of impoundment law. *See, e.g., United States v. Ponce*, 8 F.3d 989, 995 (5th Cir.1993) ("By impounding [the truck, the police] ensured that the truck was not left in a public parking lot where it could have become a nuisance, and where it could have been damaged or stolen."); *United States v. Johnson*, 734 F.2d 503, 505 (10th Cir.1984) (stating that concern about vandalism comes within the "community caretaking functions" justifying im-

poundment); 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 7.3(c), at 519 (3d ed.1996) (stating, in the subsection entitled "Impoundment of vehicle for safekeeping," that courts are generally of the view that a vehicle may be impounded to ensure its protection); *cf. United States v. Martin,* 982 F.2d 1236, 1240 (8th Cir.1993) ("Police may take protective custody of a vehicle when they have arrested its occupants, even if it is lawfully parked and poses no public safety hazard.") (citations omitted).

The Court also notes the Government's argument that *Duguay* is distinguishable from the instant case in part because in *Duguay* the Seventh Circuit also found the police had no standardized procedure regarding impoundment. *Id.* at 351–52. However, this position must be rejected because *Duguay* stressed that the impropriety of the liability-for-vandalization/theft/damage rationale for impoundment was an "independent" basis for suppressing the evidence. *Id.* at 351. Furthermore, to the extent the Government argues *Duguay* is distinguishable because here Boyette could not take custody of Cooley's car even with Cooley's consent because she did not have her driver's license with her, this position is undermined by the fact that the officers would not have let her take the car even if she had her license because she was not a co-owner of the car. In addition, the Court does not read *Duguay* for the proposition that the invalid liability-for-vandalization/theft/damage rationale for impoundment somehow becomes a valid impoundment rationale in the absence of another driver being able to take custody of the car.

As a final point on this issue, the Government has cited the concern that if the police department had left the car and it had been vandalized or stolen, even without a legal duty to protect the car the police could possibly have had to bear the cost of defending against a frivolous lawsuit by Cooley until the case would be thrown out of court. To prevent this occurrence, however, the police could have taken any number of protections, such as driving Boyette the 1–1/2 blocks home to get her license so that she could take custody of the car. To the extent the police were concerned about the nuisance value of Cooley suing them if Boyette then got into an accident with Cooley's car, the police could have taken any number of other actions, including having Cooley sign a waiver of rights form.

■ For the above reasons, the Court finds that *Duguay* controls the impoundment issue in this case, and that the police rationale for impounding the car was not reasonable under the Fourth Amendment. *Id.* at 352–53. Furthermore, the Court finds the police did not have any concomitant proper reason for impounding the car. There is no evidence the car was illegally parked and thus a safety hazard to passing cars, which would have allowed the car to be removed as part of the police's caretaking functions pursuant to *Opperman*. *See, e.g., id.* at 352. Thus, because the impoundment of the car was improper, the resulting inventory search of the car was invalid, warranting the suppression of the SKS rifle with magazine and shotgun shell found during the search. *Id.* at 352–54. Indeed, the police did not see either of these items in plain view before conducting the inventory search, and because they had no probable cause to believe these items or any other contraband were in the car before inventorying it, these items are not admissible through any other rationale for conducting an automobile search. *Id.* at 352. Accordingly, the evidence found during the inventory search, including the SKS rifle with magazine in the trunk and the shotgun shell in the glove compartment, is inadmissible as fruit of the improper impoundment. *See, e.g., id.* at 352–54.

## CONCLUSION

For the reasons set forth above, the Motion to Suppress and Motion Requesting Evidentiary Hearing is **GRANTED.** The Court **ORDERS** that all evidence

found as a result of the inventory search of Fushaun Cooley's car, including the SKS rifle with magazine in the trunk and the shotgun shell in the glove compartment, be **SUPPRESSED.**