UNITED STATES of America, Appellee,

v.

Zachary MARSHALL, Appellant.

No. 92–2084.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 10, 1992.

Decided Feb. 9, 1993.

Rehearing Denied March 11, 1993.

Stephen H. Gilmore, Clayton, MO, argued, for appellant.

James K. Steitz, Asst. U.S. Atty., St. Louis, MO, argued (Dean R. Hoag, Asst. U.S. Atty., on the brief), for appellee.

Before WOLLMAN, Circuit Judge, BRIGHT and HENLEY, Senior Circuit Judges.

WOLLMAN, Circuit Judge.

Zachary E. Marshall appeals from his conviction for being a convicted felon in

possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Marshall challenges the district court's denial of his motion to suppress evidence and the sufficiency of the government's evidence. Finding that the district court erroneously admitted the gun discovered in a search of the mini-van Marshall had been driving, we reverse the conviction.

## I.

On March 28, 1991, St. Louis Police Officers David Doetzel and Kenneth Lammert noticed that an unoccupied mini-van was parked with its motor running in the 1700 block of Cole Street. At trial, Officer Lammert testified that he and his partner had known that the van belonged to or, at least, was often driven by Marshall, and that Marshall was a subject of an ongoing investigation concerning guns and narcotics. When the officers checked the van, they found that the doors were locked and the keys were in the ignition. They watched the vehicle for a short time until their shift ended, but no one entered the van.

When Officer Michael Wuellner came on duty that afternoon, he received information concerning the unoccupied mini-van. When he ran a check on the mini-van's license plate number, Officer Wuellner discovered that the vehicle had ten unpaid parking tickets and was registered to a Denice Allen. By the time he received the information, the vehicle had begun to move. Officer Wuellner subsequently pulled the vehicle over in the 1400 block of Cole Street.

The sole individual in the van identified himself as Zachary Marshall. Officer Wuellner ran a check on that name and determined that Marshall was wanted for a probation violation. Officer Wuellner then arrested Marshall and placed him in the back of his squad car. Because the mini-van had ten unpaid parking tickets, Officer Wuellner radioed for a tow truck to remove the vehicle to one of the city's impound lots, in accordance with police department policy.

What transpired next was the subject of considerable dispute at trial. It is undisputed that at some point during the arrest, Officers Lammert and Doetzel, now off-duty, saw Officer Wuellner's squad car behind the mini-van and stopped to offer assistance. At trial, these two officers and Officer Wuellner testified that they had merely closed the mini-van's door and had waited for a backup police officer and the tow truck to arrive. Officer Wuellner testified that as soon as the backup had arrived, he had driven Marshall to the local police station. All three stated that they had never conducted any search of the vehicle at the scene.

By contrast, Marshall and his cousin, who had stopped at the scene after recognizing the van, testified at trial that the officers had thoroughly searched the van at the scene. Moreover, they testified specifically that the officers had explored under the van's front seats in the course of their search, but had found nothing.[1]

After Officer Doetzel left the scene, he telephoned Detective Lou Berry in the Intelligence Division of the St. Louis Police Department. When asked why he had called Berry, Doetzel testified that Berry was the individual who had informed Doetzel and his partner that Marshall was under investigation and that the mini-van was supposedly being used in illegal activities.

While the mini-van was being towed to a city impound lot, Detective Berry telephoned Sergeant Robert Dwyer, who was working temporarily with a federal drug task force at that time. According to Dwyer's testimony, Berry told him that Marshall had been arrested and that the mini-van he had been driving was being towed to an impound lot. Dwyer testified that Berry then asked him to conduct an inventory search of the vehicle because Berry was not available to do so.

Officer Dwyer and his partner, Michael Dueker, located the vehicle at the impound lot and began their search. Dueker initiated his search "in the driver's side area,"

---

**1.** Given the decision that we reach concerning the lawfulness of the subsequent search that actually uncovered a gun, the resolution of this factual dispute becomes irrelevant.

but was able to find nothing, even after lifting the flap of material that hung down from the bottom of the seat. Approximately ten minutes later, however, Dwyer found a nine millimeter Smith & Wesson handgun lodged in the framework underneath the driver's seat. The officers also recovered a cellular phone, a Rolex watch, a box of ammunition, a small black bag, and several other personal items.

Officer Dwyer called for an evidence technician, who removed the gun and processed it for fingerprints. The technician lifted one fingerprint from the ammunition magazine, or clip, and a second partial print from the gun's slide mechanism. The technician forwarded the prints to an examiner in the department's Identification Section. After comparing the lifted prints to known prints in the department's files, the examiner determined that the print from the clip matched the file print for Zachary Marshall. He concluded that the partial print from the slide mechanism, however, did not contain enough points of comparison to allow him to make an identification.

A grand jury subsequently indicted Marshall for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Marshall filed a motion to suppress the gun as the fruit of an illegal search. Because the case was tried to the bench without a jury, the district court took the motion with the case as a whole and ruled on the admissibility of the gun when it was offered at trial. The court admitted the gun and convicted Marshall.

## II.

Marshall raises two claims of error on appeal. First, he argues that the district court erred in admitting the gun on the ground that it was properly discovered in the course of a police inventory of the minivan. Second, he claims that the government did not establish that the gun operated as designed, thereby failing to prove an essential element of the offense, namely, that the handgun was a firearm within the meaning of the statute.

The district court's admission of the gun during the trial of this case constituted the equivalent of a denial of a motion to suppress. In reviewing the grant or denial of a motion to suppress evidence on Fourth Amendment grounds, we are bound by the district court's findings of fact regarding the circumstances of the search unless we believe on the basis of the record as a whole that the district court clearly erred. *See United States v. McBride*, 801 F.2d 1045, 1046 (8th Cir.1986), *cert. denied*, 479 U.S. 1100, 107 S.Ct. 1325, 94 L.Ed.2d 177 (1987); *see also United States v. Jorgensen*, 871 F.2d 725, 728 (8th Cir.1989). We may reverse the district court's ultimate ruling on the suppression motion, however, if the ruling reflects an erroneous view of the applicable law. *Id.* Applying this standard to the present case, we hold that the district court erred in admitting the gun as the product of a lawful inventory search because the government failed to establish that the search was conducted according to standardized procedures.

■ The "cardinal principle" in Fourth Amendment search and seizure jurisprudence is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted)). When the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception. *Id.* 437 U.S. at 391, 98 S.Ct. at 2412 (citing *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970)).

In *South Dakota v. Opperman*, the Supreme Court defined what has become known as the "inventory exception" when it held that the police may lawfully conduct a warrantless search of an impounded automobile that is designed to produce an inventory of the vehicle's contents. 428 U.S.

364, 376, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976). Because the police are performing an administrative or caretaking function rather than a criminal investigatory function when they impound an automobile, the Court found that the policies underlying the Fourth Amendment's warrant requirement are inapplicable. *Id.* at 369 n. 5, 96 S.Ct. at 3097 n. 5. Thus, in the Court's view the central inquiry is whether the inventory search is reasonable under all the facts and circumstances of the particular case. *Id.* at 373, 96 S.Ct. at 3099 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 509–510, 91 S.Ct. 2022, 2059–2060, 29 L.Ed.2d 564 (1971) (Black, J., concurring and dissenting)); *see also United States v. Spencer*, 884 F.2d 360, 361 (8th Cir.1989). Using this analysis, the Supreme Court has concluded that inventory searches conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable. *Opperman*, 428 U.S. at 372, 96 S.Ct. at 3098; *see also Colorado v. Bertine*, 479 U.S. 367, 376, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987); *cf. Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990) (affirming Florida Supreme Court's exclusion of marijuana found in suitcase in car trunk where the Florida Highway Patrol "had no policy whatever with respect to the opening of closed containers encountered during an inventory search").

The reasonableness of a police inventory search of an impounded vehicle stems from increased concerns on the part of the police and a reduced interest on the owner's part. The Supreme Court has consistently stated that an individual has a diminished expectation of privacy in an automobile due to the public nature of automobile travel. *Opperman*, 428 U.S. at 368, 96 S.Ct. at 3096. To the contrary, the Court has identified substantial reasons for inventorying the contents of impounded vehicles: "the protection of the owner's property while it remains in police custody; the protection [of] the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Id.* at 369, 96 S.Ct. at 3097 (citations omitted); *see*

*also Bertine*, 479 U.S. at 372–73, 107 S.Ct. at 741–42; *United States v. Davis*, 882 F.2d 1334, 1339 (8th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 610 (1990).

In the present case, there is no dispute that the vehicle was properly impounded. Officer Wuellner testified that department policy requires the impoundment of vehicles that have ten unpaid parking tickets. Thus, Officer Wuellner did not exercise any discretion or single out the mini-van Marshall had been driving for special treatment.

Once the vehicle had been impounded, all of the reasons supporting the inventory searches in *Opperman* and *Bertine* applied to an inventory of the mini-van. Because the only occupant of the van had been arrested and was not even the owner of the vehicle (the van belonged to Marshall's aunt), the police could reasonably have concluded that the van would remain in the impound lot for a significant period of time. *See United States v. Martin*, 982 F.2d 1236, 1240 (8th Cir.1993) (passenger's arrest and driver's apparent flight supported reasonableness of preliminary inventory search). Accordingly, inventorying and removing any valuables from the vehicle protected the property of both Marshall and his aunt from the risk of theft or vandalism. Moreover, the inventory protected the police, tow truck driver, and impound lot employees from claims that they had lost or stolen the van's contents. Finally, had the police not searched the van, a loaded gun would have remained hidden in the impound lot. Ultimately, the gun might have fallen into the hands of vandals (possibly juveniles), or Marshall's partners might have attempted to retrieve it, in either case creating a substantial risk to the lot's employees and the general public. *See Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S.Ct. 2523, 2530, 37 L.Ed.2d 706 (1973) (police belief that driver of towed automobile was required to carry service revolver supported warrantless search of vehicle to protect public from revolver falling into hands of intruder). These policies point to the

reasonableness of an inventory search of the mini-van after it had been impounded.

■ "An inventory search is not constitutionally reasonable, however, merely because it serves important governmental interests. To pass constitutional muster, the search also must be conducted pursuant to standard police procedures." *United States v. Davis*, 882 F.2d at 1339. The requirement of standardized procedures serves to remove the inference that the police have used inventory searches as "a purposeful and general means of discovering evidence of crime." *Bertine*, 479 U.S. at 376, 107 S.Ct. at 743 (Blackmun, J., concurring). The requirement that standardized criteria or established routine exist as a precondition to a valid inventory search "is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. at 4, 110 S.Ct. at 1635. Stated another way, the police may not raise the inventory-search banner in an after-the-fact attempt to justify what was, as in the present case, in fact purely and simply a search for incriminating evidence.

The lack of such standard procedures caused the Supreme Court to uphold the exclusion of marijuana seized from a locked suitcase that the police discovered in the trunk of a defendant's automobile during what they claimed had been an inventory search. *Florida v. Wells*, 495 U.S. at 4, 110 S.Ct. at 1635. In *Wells*, the record contained no evidence that the Florida Highway Patrol had any policy that addressed the opening of closed containers found during inventory searches. *Id.* at 3, 110 S.Ct. at 1634. Thus, the Supreme Court held that "absent such a policy, the ... search was not sufficiently regulated to satisfy the Fourth Amendment." *Id.* at 5, 110 S.Ct. at 1635.

In this case, the government has similarly failed to present any evidence that demonstrates the existence of standardized inventory procedures adopted by the St. Louis Police Department or that Officers Dwyer and Dueker followed them in searching the mini-van. Officer Dwyer's direct testimony at trial did not mention any standard procedures whatsoever. When defense counsel provided him a second opportunity to discuss standard procedures on cross-examination, he replied that his purpose in searching the mini-van was to "locate items of value that you wouldn't necessarily want to leave in a vehicle towed, in addition to items of evidentiary value." Officer Dwyer later repeated that the search was directed toward finding evidentiary items to be used in a criminal proceeding. Officer Dueker, called as a rebuttal witness, echoed his partner's statements that the purpose of searching the mini-van was to find evidence of criminal activity.

Moreover, Officer Dwyer was unable to state even when inventory searches are to be conducted. He stated: "Well my understanding is that a vehicle will be search[ed] in conjunction with being towed, if it's being towed for a reason." From this statement, we cannot determine what reasons for towing also trigger an inventory search. Thus, we cannot know whether the mini-van was targeted for a search according to standard departmental policy or merely because Marshall had been driving it.

Having carefully reviewed the trial transcript, we find that the testimony of Officers Dwyer and Dueker does not reveal any established procedures designed to inventory and remove valuable or dangerous items from the impounded vehicle and to guide the scope of the officers' discretion in conducting the search. From their statements, the only factors guiding the officers' search appear to have been their experience and intuition regarding the likely location of incriminating items in a vehicle. Thus, we hold that the absence of standardized procedures in this case, coupled with the substantial evidence of an investigatory motive on the part of the police, rendered the search of the mini-van unreasonable under the Fourth Amendment.

■ Our holding on the unique facts of this case does not disturb the line of inventory search cases that this court has decided. The police are not precluded from con-

ducting inventory searches when they lawfully impound the vehicle of an individual that they also happen to suspect is involved in illegal activity. *See, e.g., United States v. Porter,* 859 F.2d 83, 85 (8th Cir.1988) (per curiam) ("[A]n officer's suspicion that evidence may be present does not invalidate an otherwise lawful inventory search."); *United States v. Spencer,* 884 F.2d at 361 (finding existence and application of sufficient standardized policy); *United States v. Davis,* 882 F.2d at 1339 (same); *see also United States v. Rodriguez–Morales,* 929 F.2d 780, 787 (1st Cir. 1991) ("As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure."), *cert. denied,* — U.S. —, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992); *United States v. Gallo,* 927 F.2d 815, 819–20 (5th Cir.1991); *United States v. Roberson,* 897 F.2d 1092, 1096 (11th Cir.1990). When the police follow standardized inventory procedures that impact all impounded vehicles in a similar manner and sufficiently regulate the discretion of the officers conducting the search, the reasonableness requirement of the Fourth Amendment is satisfied. *See Bertine,* 479 U.S. at 375–76, 107 S.Ct. at 741–44 (discussing possible sufficiently regulatory policies). Thus, when the police conduct inventory searches according to such standardized policies, they may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime. The lack of standardized policies in this case, however, prevents the government from justifying the search of the mini-van as a lawful inventory.

In sum, we hold that the district court erred in admitting the gun as evidence. Therefore, we do not address Marshall's second argument concerning the sufficiency of the government's case. Accordingly, because the only evidence linking Marshall to the possession of a firearm arose from the improper search of the mini-van, we reverse his conviction for being a felon in possession of a firearm and remand the case to the district court with directions to enter a judgment of acquittal.