In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-3527

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALAN K. CHERRY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1049—**Milton I. Shadur**, *Judge.*

ARGUED JUNE 15, 2005—DECIDED FEBRUARY 3, 2006

Before POSNER, COFFEY, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Alan Cherry was caught with a gun during a traffic stop and later pleaded guilty to possession of a firearm by a felon, 18 U.S.C. § 922(g)(1). In his plea agreement, Cherry preserved his right to challenge on appeal the denial of his motion to suppress the gun, which was found in the trunk of his car. The propriety of that search is the only issue before us.

Cherry's encounter with Joliet, Illinois, police began when he was stopped on Interstate 80 for speeding and failing to signal a lane change. Officer Harris testified at the suppression hearing that he smelled burnt marijuana as he approached Cherry, who provided a driver's license but not

proof of insurance. Harris then walked behind the car to deliver Cherry's licence to another officer, Officer May, while a third officer, Officer Batis, approached the car from the passenger's side. Batis testified that from his vantage point he saw a plastic bag protruding from Cherry's right-front pants pocket. Batis gestured to Harris, who testified that he understood the signal to mean that Batis saw contraband. The officers directed Cherry to exit the car, and when he did, according to Harris, the bag of marijuana in his pants pocket was visible. The officers searched Cherry, seized the marijuana, and placed him in custody. Harris then issued three tickets—for speeding, failing to signal, and driving without proof of insurance—and began completing a tow sheet to record the condition and contents of Cherry's car. At the same time Batis and May began an inventory search of the car. May found the gun in the trunk.

After he was charged in federal court, Cherry challenged the admissibility of the gun. He argued that he never should have been ordered out of his car and searched because Officer Batis could not possibly have seen the marijuana while he was still seated in the car. And, Cherry continued, since the search revealing the marijuana was unconstitutional, his drug arrest was unlawful and the inventory search that uncovered the gun was tainted.

Although Cherry was not charged with possession of marijuana, the district court first addressed its discovery. The court focused on two photographs, introduced by Cherry, of a car similar in make and model to his. The photographs show a front-seat console that the court opined would have blocked Officer Batis's view of the plastic bag in Cherry's pants pocket. The court also questioned why Officer Harris testified that he relied on Batis's observations as the basis for directing Cherry to exit the car, when Harris stated in his arrest report and testified that he himself smelled burnt marijuana. In a tenuous ruling, the court found Batis not credible and, apparently on that basis

alone, concluded that the seizure of the marijuana and the arrest of Cherry did not justify the inventory search that uncovered the gun. And though the district court never explicitly discredited Harris or explained why the officers did not have probable cause to arrest Cherry and search his car based solely on Harris's unchallenged testimony that he smelled burnt marijuana, the court moved on to consider whether the circumstances of the traffic stop were enough to authorize the inventory search.

The court observed that the traffic stop and subsequent revelation that Cherry lacked proof of insurance, under the written policies of the Joliet Police Department, prevented him from moving his car from its location alongside the interstate. In this circumstance, the court found, department policy required that the car be towed. And, the court continued, when a car is towed "on the authority" of an officer, department policy also requires an inventory search. Thus, despite concluding that it must ignore the marijuana, the court still reasoned that the inventory search had been authorized. The court, though, explained that it was denying the motion to suppress based upon the doctrine of "inevitable discovery."

Given the district court's analysis, the parties debate whether the admission of the gun was justified under the "inevitable discovery" doctrine, but resort to that doctrine is unnecessary. The "inevitable discovery" doctrine is a means for the government to avoid suppression of evidence obtained as the result of unlawful conduct by the police, *see, e.g., United States v. Brown*, 328 F.3d 352, 356-57 (7th Cir. 2003); *United States v. Langford*, 314 F.3d 892, 895 (7th Cir. 2002), and for the doctrine to apply the government must prove by a preponderance that authorities "*would* have found the challenged evidence through lawful means." *United States v. Jones*, 72 F.3d 1324, 1334 (7th Cir. 1995) (emphasis added); *see Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States. v. Pittman*, 411 F.3d 813, 817 (7th

Cir. 2005); *United States v. Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2004). In this case, however, the government has always contended that Joliet Police officers *did* find the gun through lawful means. We recognize that the government has inexplicably abandoned reliance on Officer Harris's testimony that he smelled marijuana—which seems a simple and compelling foundation for searching Cherry and ultimately the car including the trunk, *see United States v. Wimbush,* 337 F.3d 947, 950-51 (7th Cir. 2003) (smell of marijuana gave rise to probable cause for warrantless search of vehicle revealing marijuana in passenger compartment); *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992) (presence of contraband in passenger compartment is probable cause to search entire vehicle, including trunk, for additional contraband); *see also United States v. Foster*, 376 F.3d 577, 583-84, 588 (6th Cir. 2004) (smell of marijuana coming from vehicle provides probable cause to search without warrant); *United States v. Brown*, 334 F.3d 1161, 1173 & n.11 (D.C. Cir. 2003) (discovery of contraband in passenger compartment "is a factor that strongly supports the lawfulness of a trunk search"); *United States v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000) (smell of burnt marijuana gave police probable cause to search truck for drugs); *cf. United States v. Nielsen*, 9 F.3d 1487, 1491 (10th Cir. 1993) (search of trunk reasonable if initial search of passenger compartment, premised on smell of burnt marijuana, produces contraband). The government now focuses exclusively on the fact that Cherry lacked proof of insurance when the police stopped him; his lack of insurance, the government argues, was a valid basis for conducting the inventory search even if finding the marijuana on Cherry was not. But this is an argument that the search of the trunk was lawful, not an argument—like "inevitable discovery"—that unlawful conduct should not result in suppression.

Inventory searches are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment. *United States v. Wilson*, 938 F.2d 785, 788 (7th Cir. 1991). Searches conducted by the police prior to towing a car are "lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property—and protecting the police from the owner's charging them with having stolen, lost, or damaged his property." *Pittman*, 411 F.3d at 817. We review a district court's conclusion that police officers "followed standard procedure while conducting an inventory search" for clear error, *United States v. Lozano*, 171 F.3d 1129, 1132 (7th Cir. 1999); *see also United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004); *United States v. Lomeli*, 76 F.3d 146, 149 (7th Cir. 1996); *United States v. Privett*, 68 F.3d 101, 104 (5th Cir. 1995), but our review of the reasonableness of the inventory search and seizure is plenary, *see United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005); *United States v. Jackson*, 189 F.3d 502, 507 (7th Cir. 1999); *United States v. Haro-Salcedo*, 107 F.3d 769, 771 (10th Cir. 1997).

We turn first to the district court's finding that the written police policies of the Joliet Police Department authorized the inventory search of Cherry's car. The court relied on two written policies. General Order 17-3 requires an inventory search "[a]ny time a vehicle is towed on the authority of a member of [the Joliet Police] Department," except in the case of a traffic accident. *See* Gen. Order 17-3, "Towing Vehicles," § 1.3 (2003). General Order 17-18, in relevant part, establishes procedures for enforcing the Illinois Mandatory Insurance Law ("I.M.I.L."), 625 Ill. Comp. Stat. 5/3-707:

    5.  ENFORCEMENT PROCEDURE

        5.1   When a sworn member stops a vehicle for a traffic law violation or investigation of a traffic accident, he will request proof of insurance documents from vehicle operators. No

member will stop a vehicle solely for the purpose of verifying the existence of a valid insurance policy.

5.2   If an operator is not driving an exempt vehicle, and cannot or will not provide proof of insurance documentation, the officer will then:

A.   in addition to any other citations, issue a citation for violation of Chapter 625 ILCS 5/3-707.

B.   cause the vehicle to be left legally parked, or, at the request of the operator, notify a tow company of the operator's choice, if the operator has a valid driver's licence. If, however, the driver does not have a valid driver's licence and does not have proof of insurance, the member must tow and impound the vehicle. The vehicle will then be released only upon a showing of proof of insurance for the motor vehicle that was impounded and notarized written consent of the release by the vehicle owner.

. . . .

6.   TOWING PROCEDURE

6.1   Vehicles will be towed only under the following circumstances:

A.   when LEADS message information verifies state registration for the vehicle has been suspended for non-compliance with the I.M.I.L.

B.   If, after being cited for violation of the I.M.I.L., the driver either drives away or attempts to drive away.

> C. If a second citation is issued to the same driver by the same officer during the same tour of duty.
>
> 6.2 If the vehicle is towed, an Offense Report, and a Vehicle Inventory and Tow Report are required.

Gen. Order 17-18, "Illinois Mandatory Insurance Law," §§ 5, 6 (2003). The district court read General Order 17-3 to require an inventory search when a police officer causes a car to be towed, and in turn relied on General Order 17-18 to provide officers the authority to order the tow of Cherry's car (because without proof of insurance Cherry could not move his car to a legal parking place).

We cannot say that the district court committed clear error in finding that the Joliet police officers followed standard procedure in conducting the inventory search of Cherry's car. General Order 17-18 prevented Cherry from driving his car after the police discovered he lacked proof of insurance. And, because the car was located alongside the interstate—where it presented a public safety hazard—the police were authorized to order it towed to a safe location.[1] Their authority to order such a tow in the interest of public

---

[1] Cherry does not argue that police engineered the initial traffic stop in this case as a "subterfuge for criminal investigations." *South Dakota v. Opperman*, 428 U.S. 364, 371 n.5 (1976). Regardless, our interpretation of the Joliet policy would not, as the dissent posits, allow police to "use the policy on inventory searches to authorize illegal investigatory searches," *post*, at 17, by simply arranging to stop *any* motorist alongside the interstate. The police's authority to search Cherry's car rested on his inability to produce proof of insurance. Had he been able to drive his car after the routine traffic stop, and had police not pursued the alternate justification that they smelled burning marijuana, it is unlikely that the inventory search could have occurred. *See Knowles v. Iowa*, 525 U.S. 113, 117 (1998).

safety is unassailable. *See South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."); *see, e.g.*, *United States v. Briggs*, 273 F.3d 737, 739 (7th Cir. 2001) (truck towed from alongside road because driver's license suspended). Moreover, a third written policy introduced by the government, General Order 17-4, provided unambiguous authority for the police to tow Cherry's car. *See* Gen. Order 17-4, "Illegally Parked, Abandoned and Inoperable Vehicles," § 2.4 (2003). The policy states that "ANY VEHICLE THAT PRESENTS AN IMMEDIATE HAZARD TO PUBLIC SAFETY WILL BE TOWED" and defines "immediate hazard" to include a vehicle that "creates or constitutes a traffic hazard which impedes the efficient movement of traffic" or "obstructs or may obstruct the movement of any emergency vehicle." *Id*. at §§ 2.4, 1 (capitalization in the original). As the officers testified, without challenge from Cherry, a car parked alongside an interstate highway meets this definition.

Cherry urges a different interpretation of the policies, principally arguing that § 6.1 of General Order 17-18 is exhaustive as to the circumstances under which a tow is authorized. That contention, however, ignores that Cherry's car was towed not only because he lacked proof of insurance but also because the car could not be left alongside the interstate without creating a hazard—a circumstance not addressed in General Order 17-18. General Order 17-4, which Cherry does not confront, explicitly addresses parked vehicles that present a hazard and provided unambiguous authority to tow Cherry's car. And, though he may disagree with the reading given General Order 17-18 by the police witnesses and the district court, we do not understand why General Order 17-4 is not dispositive.

The officers' testimony at the suppression hearing, moreover, confirms the district court's view of police policy.

*See Lomeli*, 76 F.3d at 149 (relying in part on officer's understanding of police policy). Officers Batis and Harris both testified that the police department's "common practice" is to tow illegally parked cars after an officer discovers the driver lacks insurance. Harris did acknowledge an alternate reading of the written policy when cross-examined by Cherry's attorney, but Batis testified without challenge that Cherry's car had to be towed (after an inventory search) because it was parked illegally. The officers' testimony strengthens our view that the district court's finding was not clearly erroneous.[2]

Nor was the search unreasonable. "Warrantless inventory searches of cars in police custody are also proper as long as the police lawfully have custody of the vehicles." *United States v. Jensen,* 169 F.3d 1044, 1048 (7th Cir. 1999). Here, again relying on General Order 17-18, Cherry argues that it was unnecessary for the police to take custody of his car and trigger an inventory search because, in his view, he had the option of requesting a towing company (and presumably specifying the destination of the car). *See* Gen. Order 17-18, at § 5.2(B). But, putting aside that Cherry never did say that he wanted to arrange for a tow himself, the answer is the same: General Order 17-4, not General Order 17-18, covers parked vehicles that present a hazard, and General Order 17-4 directed the police to tow the car. That directive

---

[2] The dissent observes that police "conduct cannot fill a gap in the policy" because, in this case, the police searched Cherry's car "because they were looking for marijuana." *Post*, at 18. The officers, though, testified to the department's "established routine" for such stops. *See Florida v. Wells*, 495 U.S. 1, 4 (1990); *United States v. Lozano*, 171 F.3d 1129, 1132 (7th Cir. 1999); *United States v. Duguay*, 93 F.3d 346, 350-51 (7th Cir. 1996). Their testimony—that cars like Cherry's are towed as a matter of practice—is consistent with our interpretation of Joliet policy.

does not compel the officers at the scene to invite or accept input from the motorist as to the appropriate disposition of his vehicle, nor does the Fourth Amendment demand that police offer a motorist an alternative means of removing his vehicle that will avoid the need to tow it and conduct an inventory search.[3] *See Colorado v. Bertine,* 479 U.S. 367, 373-74 (1987) (police need not give motorist "an opportunity to make alternative arrangements" that avoid impound-ment); *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983) ("The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means."); *Privett*, 68 F.3d at 104 (finding search within inventory exception to Fourth Amendment, even though vehicle could have been towed to motorist's home rather than impound lot); *United States v. Skillern*, 947 F.2d 1268, 1275-76 (5th Cir. 1991) (police not required to offer motorist alternative to impoundment); *cf. United States v. Penn*, 233 F.3d 1111, 1116-17 (9th Cir. 2000) (absent policy requiring consent of owner for search, police need not allow motorist to remove property from car prior to routine inventory search). Thus, even if events conspired to deprive Cherry of the opportunity to request a specific towing company, no Fourth Amendment violation has occurred; the police were free to tow his hazardously parked car pursuant to their standard policy, in furtherance of their "community caretaking" function. *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *see Opperman*, 428 U.S. at 375-76; *Lomeli*, 76 F.3d at 148 (7th Cir. 1996).

AFFIRMED.

---

[3] We decline to reach the hypothetical suggested by the dissent, *post*, at 19. The record does not show that Cherry requested that a specific company tow his car to his home, or elsewhere. *Colorado v. Bertine* does not require the police to offer that alternative, *see* 479 U.S. 367, 373-74 (1987), and thus we need not decide whether police would have a valid interest in conducting an inventory search of a car under those circumstances.

POSNER, *Circuit Judge*, dissenting. Police who lawfully impound a car or other vehicle have a right to search it stem to stern in order to take an inventory of its contents, because they're responsible for those contents for as long as the car and its contents are in their custody. *Colorado v. Bertine*, 479 U.S. 367, 373 (1987) ("by securing the property, the police protected the property from unauthorized interference. Knowledge of the precise nature of the property helped guard against claims of theft, vandalism, or negligence. Such knowledge also helped to avert any danger to police or others that may have been posed by the property"); *South Dakota v. Opperman*, 428 U.S. 364, 372-73 (1976); *United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005) ("warrantless inventory searches of vehicles are lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property—and protecting the police from the owner's charging them with having stolen, lost, or damaged his property"). Whatever they see in the course of a lawful inventory search, as in any other lawful search, they can seize and use as evidence against the car's owner.

Cherry was stopped by police for speeding and for changing lanes without signaling. A stop for a routine traffic offense (as distinct from a lawful custodial arrest of the driver or an occupant, *Thornton v. United States*, 541 U.S. 615, 617 (2004); *United States v. Pittman*, *supra*, 411 F.3d at 815-16) does not justify a search of the car. *Knowles v. Iowa*, 525 U.S. 113, 117-18 (1998); *United States v. Garcia*, 376 F.3d 648, 650 (7th Cir. 2004); *Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003). But one police officer testified that when he approached the car after pulling it over he saw a bag of marijuana, and a second officer testified that he smelled marijuana; so the police searched the car and in the trunk found a gun. The district judge disbelieved the testimony of the officer who said he had seen a bag of marijuana, but without considering the

credibility of the other officer held the seizure of the gun legal on the ground that the police would have impounded the car after stopping it for the traffic offenses because Cherry had no proof of liability insurance, and that having impounded it the police would have conducted a lawful inventory search, which would have turned up the gun.

*Florida v. Wells*, 495 U.S. 1 (1990), holds that inventory searches are proper only when they are conducted pursuant to "standardized criteria" or "established routine." *Id.* at 4; see also *Colorado v. Bertine*, *supra*, 479 U.S. at 374 n. 6, 375-76; *South Dakota v. Opperman*, *supra*, 428 U.S. at 374-76; *United States v. Wilson*, 938 F.2d 785, 788-90 (7th Cir. 1991); *United States v. Bullock*, 71 F.3d 171, 177-78 (5th Cir. 1995); *United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993). That makes it sound as if the constitutionality of the search depends on whether the police have complied with local law. But that can't be right. If the local law violates the Constitution, compliance with the local law cannot justify the search; and if a search is reasonable within the meaning of the Fourth Amendment, the fact that it violates local law does not give the defendant a federal remedy. *United States v. Delaporte*, 42 F.3d 1118, 1119 (7th Cir. 1994); *Gordon v. Degelmann*, 29 F.3d 295, 300-01 (7th Cir. 1994); *United States v. Clyburn*, 24 F.3d 613, 616-17 (4th Cir. 1994). An inventory search might not be authorized by a policy, but if the search conducted by the police was in fact a reasonable inventory search—maybe they searched the car because they feared being accused of stealing the owner's property— there would be no basis for a constitutional objection.

The cases like *Wells* that emphasize standardized criteria, standard procedures, established routine, and the like worry that in the absence of formal procedures determining the metes and bounds of inventory searches, police officers would search cars at will for evidence of crime and if challenged say they were conducting an inventory search.

The inventory search would then be "a pretext concealing an investigatory police motive." *South Dakota v. Opperman*, *supra*, 428 U.S. at 376. "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells, supra*, 495 U.S. at 4. Compliance with established procedures is merely a ruse antidote. "[A] locally followed practice gives some assurance that a particular car was not singled out for special searching attention. Absent such assurance some special reason for the taking of safeguarding or security precautions that are not customarily taken should exist if the intrusion resulting from the taking of such precautions is to be rendered reasonable under the fourth amendment." *United States v. Hellman*, 556 F.2d 442, 444 (9th Cir. 1977).

In other words, the absence of a rule creates a presumption that the search was not a bona fide inventory search. There is no need to go further and insist that inventory searches *always* violate the Fourth Amendment unless they comply with a preexisting rule, and thus to supplement, *Miranda*-like, the Constitution in order to make it easier for the courts to detect constitutional violations. That an inventory search can violate such a rule without violating the Fourth Amendment is shown by *United States v. Lomeli*, 76 F.3d 146, 149 (7th Cir. 1996). The inventory-search rule required that inventory searches be conducted at the scene of the arrest, but the search of Lomeli's vehicle was conducted at the police station instead. The court held that the search complied with the Fourth Amendment because the motive for violating the rule was simply that the superior lighting at the police station would enable the police to better account for and secure any valuables they might find in the vehicle. The inventory search was not a pretext for investigation.

Whether the requirement of a preexisting rule is rigid, as *Wells* implies, or, as we thought in *Lomeli* and the Ninth Circuit thought in the *Hellman* case, can bend, we must

examine the Joliet Police Department's policy governing the impoundment of vehicles to make sure that an inventory search would have been the expected sequel to Cherry's inability to prove that he had liability insurance; for if not the inevitable-discovery rule cannot save the search.

This is a difficult inquiry because the department's policy, a written policy (it need not be to pass muster, *United States v. Duguay*, 93 F.3d 346, 351-52 (7th Cir. 1996); *United States v. Walker*, 931 F.2d 1066, 1068 (5th Cir. 1991), but the only policy to which we have been directed in this case is written), is a mess. The provision that appears to govern this case is General Order 17-18 § 5.2(B), which provides that if the driver of a vehicle stopped by the police can't produce proof of liability insurance, the police shall either "cause the vehicle to be left legally parked, or, at the request of the operator, notify a tow company of the operator's choice, if the operator has a valid driver's license. If, however, the driver does not have a valid driver's license and does not have proof of insurance, [the police officer] must tow and impound the vehicle." Cherry had a valid driver's license but his car was not legally parked, having been stopped by the police at the side of a busy highway, so the first clause of the first sentence in paragraph 5.2(B) was not applicable. But the second one was, and it says nothing about impoundment. The car has to be towed, but why to a police lot unless the police want to search it on the basis of "suspicion of evidence of criminal activity"?—an improper motive (unlike the motive in *Lomeli*) for an inventory search, *Colorado v. Bertine*, *supra*, 479 U.S. at 375, as it has nothing to do with the purposes, quoted from *Bertine* above, of such a search. See also *United States v. Duguay*, *supra*, 93 F.3d at 353-54; *United States v. Ibarra*, 955 F.2d 1405, 1410 n. 5 (10th Cir. 1992).

Granted, we may have gone too far when we said in *United States v. Duguay*, *supra*, 93 F.3d at 353, that "the decision to impound an automobile, unless it is sup-

ported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots." The Supreme Court's decision in *Bertine* suggests that a rule that all towed vehicles shall be impounded is reasonable within the meaning of the Fourth Amendment; the owner need not be given an opportunity to make alternative arrangements even if they would protect the valid interest of the police in shielding themselves from charges of theft or damage to the owner's property as well as from the danger that the vehicle may contain weapons that might be used against them. *Colorado v. Bertine*, *supra*, 479 U.S. at 373-74.

But Joliet has not gone to the outer limits permitted by the Court. Its policy says that if the driver can't produce proof of liability insurance, the police shall either "cause the vehicle to be left legally parked, or, at the request of the operator, notify a tow company of the operator's choice, if the operator has a valid driver's license." It does not authorize impoundment when the driver has a valid license—unless "*left* legally parked" makes the entire sentence applicable only to legally parked cars, which is to say to situations in which the driver, though he could leave the car where it is, may prefer that it be elsewhere, presumably his home. If so, he can have it towed there instead of leaving it where it is. (He is not permitted to drive it there because he lacks proof of insured status.) But that would leave unaddressed the situation in which the driver, though he has a valid driver's license, is parked illegally.

It might be thought that the reason that situation is left unprovided for is that *of course* a car can be towed if it is illegally parked on a public street, General Order 17-4 § 2.4; and in the usual case there is no one in the car and so the tow *necessarily* is arranged by the police and the car is in their custody and therefore they can conduct an inventory search. *South Dakota v. Opperman*, *supra*, 428 U.S. at

375-76; *United States v. Pittman, supra*, 411 F.3d at 817; *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001). That is the provision of Joliet's policy on which the majority hangs its hat. But the only reason Cherry's car was illegally parked was that he'd been pulled over by the police, so he was present and therefore there was no need for the police rather than Cherry to handle the tow. It would be bootstrapping for the police to argue that if they want to search a car that they've stopped for speeding or some other traffic offense that would not ordinarily justify a search of the car all they have to do is arrange to stop it in a place where it cannot be parked legally. That would be to use the policy on inventory searches to authorize illegal investigatory searches.

To make matters still more confused, General Order 17-18 § 6.1 provides that "vehicles will be towed only under the following circumstances"—and none of them is applicable to this case. This is in flat contradiction of the preceding section of General Order 17-18 (§ 5.2(B)). And then there is General Order 17-3 § 1.3(A), which provides that any time the police order a car towed, they shall conduct an inventory search. This is also in conflict with section 5.2(B), which requires towing if the driver has no proof of insurance, but impoundment only if, in addition, he doesn't have a valid driver's license (which Cherry, remember, did).

Suppose General Order 17-3 § 1.3(A) takes precedence and therefore authorizes an inventory search even when the car is towed to the driver's home by a tow company summoned by the driver. The district court thought that, if so, that's the end of the case. That is incorrect. A police department's policy concerning inventory searches cannot override the Fourth Amendment. Police cannot demand entry into a person's home in order to inventory the contents. An inventory search has to be in service of a legitimate interest unrelated to suspicion of criminal activity if it is to comply with the Constitution. No such interest is engaged if the

driver is present when the car is stopped, he arranges the tow, and the car is towed to his home. In such a case there is no constitutional basis for an inventory search because the car and its contents are never in police custody. E.g., *People v. Litchfield*, 918 P.2d 1099, 1105-06 (Colo. 1996); *Fortson v. State*, 412 S.E.2d 833, 834-35 (Ga. 1992); *Caplan v. State*, 531 So.2d 88, 90 (Fla. 1988); cf. *United States v. Edwards*, 242 F.3d 928, 938 (10th Cir. 2001).

So this interpretation of Joliet's policy, which would be necessary to uphold an inventory search in this case, would be unconstitutional. The constitutional interpretation would not justify the search. I said earlier that an inventory search could be proper even if it didn't comply with a formal policy on such searches, but the only justification that could be offered for an inventory search in this case would be compliance with Joliet's policy. The police of course searched Cherry's car not because they thought they were conducting an inventory search but because they were looking for marijuana, so their conduct cannot fill a gap in the policy. In sum, then, neither the Joliet policy, nor the circumstances, justified the police in impounding Cherry's car; and without impoundment, there was no justification for an inventory search of the car.

Two of our cases uphold inventory searches without discussion of whether the defendant's car was impounded, *United States v. Bass*, 325 F.3d 847, 849-50 (7th Cir. 2003); *United States v. Sholola*, 124 F.3d 803, 808, 818 (7th Cir. 1997), but their silence should not be understood to signify that police can conduct an inventory search even though they have no grounds for taking custody of the vehicle. Unless it's impounded and the owner therefore deprived of custody of its contents, there is no constitutional basis for an inventory search. *United States v. Privett*, 68 F.3d 101, 104 (5th Cir. 1995), says that "the police could have permissibly conducted an inventory search even if the car was towed to [the defendant's] home," but in the actual

case it was not towed there. The only reason the court gave for its statement was "the problem of security of the contents." If, however, the owner of the car has it towed to his home by the towing company of his choice, the police have no valid interest in inventorying the contents because they are not potentially responsible for any loss of or damage to them, they are not endangered by the contents, and the owner has taken it on himself to protect the property from being damaged or lost en route to his home.

The judgment cannot be upheld on the basis of the district court's reasoning. The case should be remanded for a determination of the credibility of the officer who testified that he smelled marijuana. If that testimony is credited by the district judge, there was probable cause to search the car; if not, not, and the evidence of the gun should be suppressed.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*