

FILED

Feb 21 2017, 7:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel C. Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Otis Sams, Jr.,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | February 21, 2017<br><br>Court of Appeals Case No.<br>67A01-1604-CR-814<br><br>Appeal from the Putnam Circuit Court<br><br>The Honorable Matthew L. Headley, Judge<br><br>Trial Court Cause No.<br>67C01-1502-F3-32 |

**Mathias, Judge.**

[1]     Otis Sams ("Sams") was convicted in Putnam Circuit Court of Level 4 felony possession of methamphetamine. Sams appeals, challenging the warrantless search and seizure of the evidence against him. We conclude that the State did

not carry its burden to show that the inventory search of Sams's truck was sufficiently regulated; therefore, we reverse.[1]

## Facts and Procedural History

February 20, 2015, was a snowy night in Greencastle, Indiana. Late that evening or early the next morning, Sams had recently finished work on a home remodeling job and was headed for home, outside of town, driving a family member's truck. Sams had no car of his own because his driver's license had been suspended, but Sams drove his family member's truck anyway.[2] Before leaving town, Sams stopped at a fast-food restaurant and purchased his supper to go, eating as he drove.

At the same time, a sworn officer and a trainee reserve officer of the Greencastle Police Department ("GPD"), Christopher Jones ("Jones") and Justin Tate ("Tate"), were patrolling Greencastle's streets in their squad car. When Sams's truck passed the officers going in the opposite direction, Tate noticed the truck had no working taillights. "That is an infraction in the [s]tate of Indiana," as Jones later noted. Tr. p. 188. The officers turned their car

---

[1] We heard argument in this case on January 24, 2017, at the Eidson-Duckwall Recital Hall on the campus of Butler University in Indianapolis. We thank our hosts, particularly Dr. Rusty Jones, Dr. Jason Lantzer, and the staff at the hall, for the warm welcome we received, and those in attendance for their interest, attentiveness, and the engaging question-and-answer session following argument. We also thank counsel for their spirited advocacy and their enthusiastic participation in the question-and-answer session.

[2] It was conceded at argument that this fact does not impair Sams's Fourth Amendment standing.

around and pulled Sams over near the intersection of Jackson Street and Shadowlawn Avenue.

[4] The officers approached Sams and asked for his driver's license and the truck's registration. Sams was the truck's only occupant. The truck was in poor condition and smelled like freshly cooked hamburger. Next to Sams on the passenger seat and center console sat a fast-food bag and a hamburger box. As he continued to eat his hamburger, Sams produced the vehicle's registration but, rather than a driver's license, handed the officers a state-issued identification card. The officers took Sams's papers back to their squad car to process them. There, after several minutes, the officers discovered that Sams was driving on a suspended license for the second time in ten years, a misdemeanor criminal offense.

[5] With this information, the officers were faced with the question of what to do with a truck stopped at night on a public road that was cold and slick in a snowstorm, without a licensed driver to drive it away. Jones decided that conditions required Sams's truck to be impounded and towed. "[From t]he position of the vehicle[, we] couldn't leave it where it was. [We c]ouldn't . . . spend time waiting on someone to drive [in] from out of town [to claim the truck]. So we impounded the vehicle." Tr. p. 9.

[6] Jones chose to issue Sams a summons for the misdemeanor rather than arrest him. The officers returned to the truck to tell Sams the truck would be towed and to give him the summons. Sams said he would have someone pick him up

from a nearby gas station. The officers patted Sams down and told him he was free to leave. Sams left the truck and walked to the gas station to wait.

[7] Around this time, a second reserve officer and a second sworn officer, Kyle Lee ("Lee"), arrived on the scene, bringing the total number of officers to four. Jones and Lee began to inventory the contents of the truck before the tow truck arrived. Jones and Lee began their inventorying process on opposite sides of the truck's cab. Several personal items were scattered about the cab, including an orange gas can, a pair of gloves, an ashtray, a snow scraper, and, we infer, some tools Sams used in his renovation work.

[8] From the driver's side, Jones noticed the fast-food bag, previously next to Sams in the front of the cab with the hamburger box, now sat folded up on the floorboard behind the passenger seat in the rear of the cab. Jones immediately became suspicious. Jones told Lee, "[H]ey[,] check that bag. Just make sure nothing's in it." Tr. p. 13. Lee opened the bag. Inside the bag was the hamburger box. Inside the hamburger box were lettuce, ketchup, and more than twenty-five grams of methamphetamine.

[9] The officers walked to the nearby gas station and found Sams there, still waiting to be picked up. The officers arrested Sams without incident. The officers then wrote up their complete inventory of the truck: "Misc tools." Ex. Vol., State's Hr'g Ex. 6. At some point "after [the officers] found what [they] found [they] took photos just to document. [They] had to place everything back in the general location where [they] found it just for documentation purposes." Tr. p.

219. Three pictures were taken: two of the inside of the bag and box, one of the outside of the bag, not very neatly folded,[3] and what appears to be a part of the orange gas can and the handle of the snow scraper at the edges of the frame. Ex. Vol., State's Trial Exs. 1-3; *see* Tr. p. 178. The truck was towed shortly thereafter, and it is unknown what became of it or its contents. *See* Tr. p. 14.

[10] On February 23, 2015, Sams was charged with Class A misdemeanor driving while license suspended and Level 3 felony possession of methamphetamine, later reduced to Level 4 felony possession. On November 2, 2015, Sams moved to suppress the methamphetamine. At a hearing on November 25, 2015, the court heard evidence and argument and ordered briefing. The court denied Sams's motion on January 6, 2016. Sams sought certification for interlocutory appeal, which the court denied on February 1, 2016, in an order issued on February 4, 2016.

[11] Sams's case was tried to a Putnam County jury on February 3, 2016. The methamphetamine seized from the truck was admitted over Sams's objection. The jury returned guilty verdicts on both the misdemeanor driving while suspended and the felony possession charges. On March 10, 2016, Sams was

---

[3] Laying a foundation for the admission of the photographs, Lee was asked whether the picture "appear[ed] to be an accurate representation of what the bag looked like when [he] found it?" Tr. p. 178. "Yes sir it is," said Lee. *Id.* When asked why, in that case, the bag did not appear to be as neatly folded as the officers' testimony had suggested, Jones replied that the picture had been taken "after [the bag] had already been opened by [the officers] . . . and Officer Lee didn't roll it up nice and neat like how we first observed it. . . . This [picture is] not accurate as to how we actually initially observed it." Tr. pp. 218-19. One of the officers was doubtlessly correct.

sentenced to time already served for the misdemeanor, and to ten years, nine and one-half executed, in the Indiana Department of Correction for the felony.

[12]   This appeal followed. Sams challenges the admission of the methamphetamine as the inadmissible fruit of an unlawful search under the Fourth Amendment. He raises no separate argument under our state constitution.

## Standard of Review

[13]   Our review of denials of motions to suppress, when following a trial at which the challenged evidence was admitted, is properly a review of the trial court's decision to admit the evidence. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). We review the trial court's ruling on admissibility for abuse of discretion, reversing only if the ruling is clearly against the logic and effect of the facts, and the error effects substantial rights. *Id.* The constitutionality of a search or seizure is a pure question of law we review de novo. *Id.* Because the search in this case was done without a warrant, the burden of showing its constitutionality was on the State. *Berry v. State*, 967 N.E.2d 87, 90 (Ind. Ct. App. 2012).

# Discussion and Decision

### I. Sams Timely Appealed

[14]   The State suggests that Sams's appeal "may be untimely." Appellee's Br. p. 6. However, the State's reliance on *Smith v. Deem*, 834 N.E.2d 1100 (Ind. Ct. App. 2005) (period for filing notice of appeal begins to run when parties have actual notice of final judgment), *trans. denied*, has been mooted by intervening amendment to the Indiana Rules of Appellate Procedure. App. R. 9(A)(1)

(period for filing notice of appeal begins to run when final judgment entered into chronological case summary); Bryan H. Babb & Curtis T. Jones, *Developments in Indiana Appellate Procedure: Rule Amendments, Remarkable Case Law, and Court Guidance for Appellate Practitioners*, 44 Ind. L. Rev. 1033, 1033–34 (2011) (describing 2010 amendment putting App. R. 9(A)(1) in its current form). Under the current rule, there is no question that Sams timely appealed. We therefore proceed to the merits of Sams's claim.

## II. *The Inventory Search of the Fast-Food Bag and Box Was Not Sufficiently Regulated by Standardized Procedures and Was Pretextual*

[15]   The touchstone of the Fourth Amendment is reasonableness. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). When police are investigating crime, it is usually unreasonable for them to search a person's car without probable cause to think they will find evidence relevant to their investigation there. *See Myers v. State*, 839 N.E.2d 1146, 1150–51 (Ind. 2005). However, when police have taken lawful custody of a person's car,[4] whether to protect the public, *see Cady v. Dombrowski*, 413 U.S. 433, 441 (1973) (first recognizing community caretaking doctrine), or because otherwise authorized by state law, *Fair v. State*, 627 N.E.2d 427, 431 (Ind. 1993), they are responsible for the car and anything inside it. In these cases, it is reasonable for police to search the car and make an

---

[4] Sams does not challenge the officers' decision to impound the truck as it stood in a public road at night in a snowstorm without a licensed driver available to move it. Sams's concession on this point is well taken. *See Jones v. State*, 856 N.E.2d 758 (Ind. Ct. App. 2006) (upholding impoundment of car on highway shoulder when driver was unlicensed), *trans. denied*.

inventory of anything inside it for administrative reasons completely unconnected to criminal investigation: to protect the person's property and to protect themselves, as well as anyone who takes custody of the car after them, from legal liability and from physical harm. *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *Gibson v. State*, 733 N.E.2d 945, 956 (Ind. Ct. App. 2000) (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (plurality op.)).

[16] The temptation for police, of course, engaged as they are in the often competitive enterprise of ferreting out crime, *Johnson v. United States*, 333 U.S. 10, 14 (1948), is to search the car for an investigative purpose while claiming, pretextually, to search it for an administrative purpose. *Fair*, 627 N.E.2d at 435. But because Fourth Amendment reasonableness is an objective standard, *Scott v. United States*, 436 U.S. 128, 138 (1978), it misses the mark to ask only what subjective purpose individual searching officers had. Instead, we ask whether a search was reasonable under the circumstances as an inventory search. If so, we will not fault it because a searching officer wanted or expected to find evidence of a crime as he searched. *Moore v. State*, 637 N.E.2d 816, 820 (Ind. Ct. App. 1994), *trans. denied*.

[17] We thereby seek to forestall two primary Fourth Amendment evils: excessive official discretion and suspicionless criminal investigation. *Fair*, 627 N.E.2d at 435; *see generally Delaware v. Prouse*, 440 U.S. 648, 661 (1979) ("standardless and unconstrained discretion"); *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) (investigation without "particularized" suspicion). The first line of defense is regulation of the inventory search by standardized police procedures. *Florida v.*

*Wells*, 495 U.S. 1, 4 (1990); *Fair*, 627 N.E.2d at 435. Such regulation does not per se establish constitutionality; it is simply "ruse antidote." *United States v. Cherry*, 436 F.3d 769, 777 (7th Cir. 2006) (Posner, J., dissenting), *cited in United States v. Cartwright*, 630 F.3d 610, 615 (7th Cir. 2010). When both the initiation *and* the scope of an inventory search are guided or directed by such procedures, *Fair*, 627 N.E.2d at 435, we are very reluctant to find a constitutional violation — reluctant, but not unwilling, as the search protocol itself may be unconstitutional. *See Cartwright*, 630 F.3d at 614-15.

[18]     Assuming a valid protocol, however, we approve searches under it and tolerate minor deviations from it. *See, e.g., Jackson v. State*, 890 N.E.2d 11, 18-19 (Ind. Ct. App. 2008) (search not unreasonable where differently titled form filled out by different officer than required by policy). Even major deviations do not automatically require suppression if the inventory search fulfilled its administrative purposes and there are no other indications of pretext for an investigative purpose. *See, e.g., Whitley v. State*, 47 N.E.3d 640, 648 (Ind. Ct. App. 2015), *trans. denied*. However, major deviations may give rise to an inference of pretext which the State must overcome. *See, e.g., Weathers v. State*, 61 N.E.3d 279, 288–89 (Ind. Ct. App. 2016).

[19]     There are, then, three basic types of inventory cases: the "minor deviation from policy" cases, the "major deviation from policy" cases, and the "no policy" cases. The State almost always prevails in the "minor deviation" cases because there is no basic inference of pretext. The State always loses the "no policy" cases because the search is totally, and therefore excessively, discretionary. The

"major deviation" cases are difficult to generalize about, turning on whether the search nonetheless fulfilled its administrative purposes and on whether the State can dispel inferences of pretext. We believe this case falls somewhere between the "no policy" and "major deviation" cases.

[20] In some "no policy" cases, police have actually failed to establish any inventory policy whatever. *See, e.g., Edwards v. State*, 762 N.E.2d 128, 133 (Ind. Ct. App. 2002) ("[T]he record does not . . . even indicate there is . . . a policy."), *trans. denied*. In others, the purported "policy" is really none at all. *See, e.g., Fair*, 627 N.E.2d at 436 ("[The searching officer] testified *only* that 'we conduct an inventory search of the car to see what kind of items are in it[, to see if] there's anything valuable that might need to be . . . noted as being in the car.'" (original emphasis)). Finally, in some, the policy is silent on a critical point, vesting police with too broad a discretion and thereby failing sufficiently to regulate the search. *See, e.g., Wells*, 495 U.S. at 4–5 (no policy as to closed containers); *State v. Lucas*, 859 N.E.2d 1244, 1250–51 (Ind. Ct. App. 2007) (no policy as to locked containers), *trans. denied*. Discretion per se is not prohibited, but free-flowing, "uncanalized discretion" is. *Wells*, 495 U.S. at 4. It is important to remember that any discretion the policy affords must be "exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id.* (quoting *Bertine*, 479 U.S. at 376 (Blackmun, J., concurring)).

[21] At the time of Sams's arrest, the GPD had a written policy on impounding and inventorying cars ("the written policy"). At the beginning of the written policy,

but not under the section on "Inventory Procedures," the written policy provides, "When the driver/owner of a vehicle is arrested, and if the vehicle is subject to a lawful impound, the arresting officer *will* make an inventory of the vehicle for *valuables*." Ex. Vol., State's Hr'g Ex. 1 (emphasis added). The section on "Inventory Procedures" is reproduced here in full:

> A. On the inventory form, the officer *shall list all* personal property and *all* vehicle accessories such as radios, tape player[s], etc., and shall describe the vehicle's condition.
> B. Upon completion, the inventory form will be signed by both the wrecker driver and the impounding officer.
> C. The original copy of the vehicle inventory/impound will be turned in with the report. A copy will be given to the wrecker driver.

Ex. Vol., State's Hr'g Ex. 1 (emphasis added). The written policy thus contains only one absolute directive for conducting the search itself: to inventory "all personal property and all vehicle accessories . . . ." *Id.*

[22] However, this is not what GPD officers actually do. Rather, a "standard check of the vehicle" means "[m]ak[ing] sure there is nothing valuable or hazardous and check[ing] the vehicle from front to back. That is what we typically do." Tr. p. 18 (testimony of Jones) ("the unwritten policy").

> [O]ur policy . . . [is] basically [to] put down stuff that you would be liable for. *[W]e don't go through and pick up every single piece, article, . . . crumb, anything in the vehicle.* [Rather, w]e look at the vehicle and make sure anything that would be valuable [is inventoried], if you look at [it and determine] that's valuable . . . [. O]r [if] the person . . . will speak up, [and say, "H]ey don't let

anything happen to such and such,["] we will put it on the inventory sheet. *But I just go by my view of what's valuable.*

Tr. pp. 22–23 (testimony of Jones) (emphasis added).

[B]asically what you're looking for are valuables. Things that you know would [make the GPD liable] if something would happen to them. Liable [to] the owner or maybe it's a . . . safety risk . . . to us or to the public if we left that in [the] vehicle.

Tr. p. 198 (testimony of Jones).

[23] The written policy lists "radios" as an example of a "vehicle accessor[y]" required to be inventoried. *Id.* When asked why he did not list the truck's radio on the inventory sheet, Jones replied that

A.    I didn't see any radios of value.

Q.    Your [de]termination is that only items of value that you deem [of] value or the operator of the car deems [of] value[,] you put on the inventory [form]?

A.    That I would consider [of] value for liability [purposes]. Yes.

Q.    And that is . . . distinct from what [the written] policy says for you to do?

A.    That's what I interpret the policy to mean.

Q.    But your policy says the officer shall list all personal property and vehicle accessories. To you, *that means you get to list what you want to see added*?

A.    Such as, *yes*.

Q.    That's . . . your personal belief, not what the policy is?

A.    That's my interpretation of the policy.

Q.    Okay, that's how you're trained on it? . . . .

A.      That's how I was trained and that's how we, that's how
        I've always d[one] it. If it's of value we put . . . [it] on [the]
        inventory sheet.

Q.      *Your training is to provide your own distinct interpretation [of]
        the policy*?

A.      Of how we interpret it, *yes*.

Tr. p. 223 (emphasis added).

[24]    The written policy thus conflicts both with itself and with the unwritten policy. We suspect that the written policy exists for the sake of reviewing courts and the unwritten policy for the sake of officers in the field. Even if the policies are not programmatically pretextual in this way, *see Brigham City*, 547 U.S. at 405 (scope of inquiry into "programmatic purpose"), their conflict affords GPD officers excessive discretion in allowing officers to choose which of two protocols will govern their searches. *See United States v. Rowland*, 341 F.3d 774, 779-80 (8th Cir. 2003) (invalidating inventory search) ("[O]ur research has not revealed a case allowing the written procedures of law enforcement [requiring inventory of 'all' property] to be eroded by unwritten practice [requiring inventory only of items perceived to be 'particularly valuable.']").

[25]    In addition, the unwritten policy alone vests GPD officers with an excessive discretion. It is indistinguishable from what *Fair* held to be no policy at all: "[W]e conduct an inventory search of the car [to see if] there's anything valuable that might need to be . . . noted as being in the car . . . ." *Fair*, 627 N.E.2d at 436; *see also Rhodes v. State*, 50 N.E.3d 378, 382 (Ind. Ct. App. 2016) (invalidating inventory search) (inventory "to make sure no valuables are left

inside the vehicle before it's towed"), *trans. denied*. In part, this is because inventory searches are definitionally searches for valuables (and, to some degree, dangers).[5] *See Opperman*, 428 U.S. at 369-70. Without further definition by standardized criteria, a policy "to inventory for valuables" gives officers unconstitutionally broad discretion. There is nothing in the record of what standardized criteria GPD officers use to decide what is "valuable" under the policy. Jones even testified that the GPD trains its officers "to provide [their] own distinct interpretation" of the written policy, frustrating the development of such criteria. Tr. p. 223. As a result, officer discretion is completely unconstrained. "I just go by my view of what's valuable," Jones testified. Tr. p. 23. Jones simply "get[s] to list what [he] want[s] to see added" to the inventory form. Tr. p. 223. A police officer picking through a person's belongings without

---

[5] The State fares no better by substituting "dangerous" for "valuable." Though less frequent than references to "valuable" items, there was testimony that the unwritten policy included dangerous in addition to valuable items. *See* Tr. p. 198.

"The third interest [served by inventory searches] — protecting the police from potential danger — failed to receive the endorsement of a majority of the [*Opperman*] Court . . . ." *Colorado v. Bertine*, 479 U.S. 367, 383 (1987) (Marshall, J., dissenting). Prof. LaFave opines, "[I]t is difficult to take this [third] contention seriously — if police are endangered by unsearched cars in their possession, then it would seem that the public is endangered by cars parked on the streets or other public or semi-public places. It is significant that Powell, J., concurring [in *Opperman*, 428 U.S. at 378, supplying the fifth vote], noted that '[e]xcept in rare cases, there is little danger associated with impounding unsearched automobiles . . . .'" Wayne R. LaFave, 3 *Search and Seizure: A Treatise on the Fourth Amendment* § 7.4(a), at 835 n.18 (5th ed. 2012). "As for the protection-of-the-public argument, it borders on the ridiculous." *Id.* at 843.

At oral argument, we were asked to entertain the possibility that a homemade bomb could have been concealed in the fast-food bag from which the officers had seen Sams eating his supper. Without far more evidence on this possibility in the record, we find this suggestion too remote to consider. Even if it were not, surely opening the bag only increased, rather than decreased, the resulting danger to the officers, the public, and Sams's property. "No sane individual inspects for booby-traps by simply opening the container." *United States v. Cooper*, 428 F.Supp. 652, 655 (S.D. Ohio 1977). We do not think this theory, as applied to Sams's truck, describes an objectively reasonable inventory search.

suspicion, "get[ing] to list what [he] want[s] to" search, is indeed the very opposite of what the Fourth Amendment requires.

[26] We conclude that, as it existed at the time of Sams's arrest, the GPD inventory regime did not and could not sufficiently regulate inventory searches conducted under it. The conflict between the written and unwritten policies permitted an impermissible choice between them, and the unwritten policy was standardless. In short, vitiated by excessive discretion, GPD "policy" was really none at all.

[27] Even if GPD inventory policies could pass muster, neither the written nor the unwritten policy was actually followed in this case. First, there is no trigger for an inventory search described in the record other than the one appearing at the head of the written policy: "When the driver/owner of a vehicle is arrested, and if the vehicle is subject to a lawful impound . . . ." Ex. Vol., State's Hr'g Ex. 1. The written policy provides for impounding a car in situations other than the driver's arrest, *id.* ("Circumstances Warranting"), but nevertheless appears to contemplate inventory only in cases of arrest. *Id.* ("The justification for an inventory of an impounded vehicle is based on the validity of the impoundment, not the arrest of the driver."). However, Sams was not arrested before Jones and Lee inventoried his truck. Thus, written GPD policy does not authorize the inventory search here.

[28] Second, as to the unwritten policy, to the extent that any standardized criteria for deciding what is "valuable" exist, they appear routinely to require excluding from inventory items like Sams's discarded fast-food bag, from which he had

been seen eating minutes before. As Jones testified, a fast-food "trash bag" is "not something we typically put on an impound sheet" because "not what we typically consider of value, no." Tr. p. 225. It is indeed difficult to imagine what criteria could reasonably be employed to deem the bag or its likely contents "valuable," whether "for liability purposes" or any other purpose.

[29] Third, as to the written policy, we note again that GPD officers routinely disregard it, Tr. p. 23 ("[W]e don't go through and pick up every single piece . . . ."), and are in fact trained to furnish their own "distinct interpretation[s]" of it. Tr. p. 223. It is plain that "all" items in Sams's truck were not inventoried. Though the truck did not contain very many items, none were individually recorded, including one (the truck's radio) to which the written policy expressly refers. The "misc tools" notation is of no help to the State because it is not accurate. Ex. Vol., State's Trial Ex. 6. Gloves, ashtrays, and gas cans are not "tools." While we infer that there were real tools in Sams's truck, *see* Tr. p. 31, neither the inventory nor another part of the record reveals what those might have been. *See United States v. Taylor*, 636 F.3d 461, 464-65 (8th Cir. 2011) ("hundreds of valuable tools" accurately described as "misc. tools" insufficient to defeat charge of pretext).

[30] Fourth, Jones testified that, "[t]hrough part of [his] training when [he is] doing inventory searches, [he] search[es] all the containers in the vehicle," "unless they are locked." Tr. p. 19. The written policy is silent on this point. *See* Ex. Vol., State's Hr'g Ex. 1. Even assuming that Jones's testimony sufficiently establishes a policy requiring opening all closed containers, that is not what

Jones did. At least one other closed container was in the truck, the gas can. It was not opened,[6] though knowing what if anything is inside a gas can would promote the public- and officer-safety rationales of the inventory search.

[31]     The State is unable to dispel the inference of pretext arising from these major deviations from policy, particularly from the determination of the discarded fast-food bag as "valuable." Dispositively, it is clear on these facts that the fast-food bag and box would not have been searched but for the officers' suspicions of criminality. When asked whether it was Jones's intent to "preserve this trash and document it," presumably for the purpose of producing an accurate inventory of the truck's contents, Jones replied, "No. It was basically to check it because it just seemed suspicious . . . . It just seemed suspicious." Tr. p. 31. "When we found [the fast-food bag] we specifically searched the bag yes because it was suspicious." Tr. p. 224. "At that point it was a suspicious item to be searched based on the circumstances." Tr. p. 227. When asked "whether it is a suspicious thing" that "someone took [the bag] from the from the front seat, cleaned up [his] mess[,] and put it in the back," Jones replied, "Yes." Tr. p. 228.

[32]     We find further support for this conclusion in the fact that, though the bag was located on the side of the car assigned to be searched by Lee, Jones had to prompt Lee to search the bag and the box inside: "[H]ey check that bag. Just make sure nothing's in it." Tr. p. 13. If GPD policy would have prompted

---

[6] That is, there is no evidence that it was opened, and the burden was the State's.

search of the bag of its own force, presumably Jones would not have had to prompt it himself. Finally, Jones's testimony that Sams's movement of the bag from the front to the back of the truck "just didn't add up," *id.*, prompting Jones to prompt Lee's search, suggests that, had Sams simply left the bag on the front seat, it would not have been opened.

[33] We conclude that, where, as here, the item searched would not have been the target of a well-regulated inventory search, such that the item would not have been searched at all but for the criminal suspicions of the searching officer, the search is pretextual and therefore unreasonable. *Accord United States v. Kennedy*, 427 F.3d 1136, 1145 (8th Cir. 2005); *State v. Ture*, 632 N.W.2d 621, 629 (Minn. 2001); *see also Bertine*, 479 U.S. at 372 (no showing police acted for "sole purpose" of investigation).

[34] Under the facts before us, any administrative benefits of the officers' inventory search were incidental to the investigative benefits when the law required the opposite. None of the administrative purposes of the inventory search were served by the search here. The "misc tools" notation is not only inaccurate, *see supra* ¶29, but totally inadequate to those purposes. Because it does not describe any item in the truck with any specificity, the inventory would not, for example, protect Sams's gloves from theft; it would not protect the GPD from a false claim that an expensive but nonexistent drill had been lost in their custody; and it would not alert those in and around the truck at the impound lot that the truck could contain flammable gasoline or explosive gasoline vapors. This assumes particular importance in light of Jones's testimony that it is discretionary "based

on the scene" whether to conduct the inventory search at the scene or at the impound lot,[7] and that "typically [GPD officers] do it at the scene because once the vehicle leaves we don't know what happens to it." Tr. p. 14.

[35] The State's effort to rehabilitate the search by means of the three photographs taken after the methamphetamine was found is unavailing. *See Whitley*, 47 N.E.3d at 648 (photographs helped rebut inference of pretext arising from "more than minor" deviation from policy). The photographs do not, alone or together, record all the items in Sams's truck. Two of the three are of the bag and box exclusively, Ex. Vol., State's. Trial Exs. 2–3, and one is mostly of the bag, with other items shown incompletely at the edges of the frame. *Id.*, State's Trial Ex. 1. Jones testified, "[A]fter [the officers] found what [they] found [they] took photos just to document. [They] had to place everything back in the general location where [they] found it just for documentation purposes." Tr. p. 219. Under the circumstances, it is clear that the photographs were taken to document a methamphetamine investigation, not to produce an inventory of Sams's truck.

## Conclusion

[36] For these reasons, we conclude that the search of Sams's truck was not sufficiently regulated by standardized police procedures and therefore was

---

[7] *See Fair*, 627 N.E.2d at 436 (on-scene inventory by non-administrative officers as indicia of pretext). Other than to state that the decision where to inventory is "based on the scene," Tr. p. 14, Jones offered no standardized criteria used to guide that decision.

pretextual. The vague, conflicting inventory regime of the GPD was not capable of sufficiently regulating the search, but even if it was, the officers' major deviation from that regime gives rise to an inference of pretext confirmed by other evidence and not overcome by the State.

[37] The trial court abused its discretion by ruling the contrary. All fruits of the inventory search of Sams's truck were inadmissible. Because no admissible evidence supported Sams's conviction for possession of methamphetamine, that conviction must be vacated. We therefore vacate Sams's conviction and remand with direction to grant Sams's motion to suppress and for any further proceedings required in accordance with this opinion.

[38] Reversed.

Kirsch, J., and Robb, J., concur.